**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

NEIL GONSALVES, as administrator of )
The Estate of MICHAEL GONSALVES )
Plaintiff, )

Vs. ) C.A. No. 06-

CA 06 76

D1. Jeffrey Derderian; )
D2. Michael Derderian; )
D3. DERCO, LLC; )
D4. Howard Julian; )
D5. Triton Realty Limited Partnership; )
D6. Triton Realty, Inc.; )
D7. Raymond Villanova; )
D8. Jack Russell; )
D9. Jack Russell Touring, Inc.; )
D10. Paul Woolnough; )
D11. Manic Music Management, Inc.; )
D12. Knight Records, Inc.; )
D13. Daniel Biechele; )
D14. Anheuser-Busch, Incorporated; )
D15. Anheuser-Busch Companies, Incorporated; )
D16. McLaughlin & Moran, Inc.; )
D19. Denis P. Larocque, Fire Inspector; )
D20. Anthony Bettencourt; )
D21. Malcolm Moore, in his capacity as Finance Director of the Town of West Warwick; )
D22. State of Rhode Island; )
D23. Irving J. Owens, Fire Marshal; )
D24. Brian Butler; )
D25. TVL Broadcasting, Inc.; )
D26. STC Broadcasting, Inc.; )
D27. Barry H. Warner; )
D28. Luna Tech, Inc.; )
D29. High Tech Special Effects, Inc.; )
D30. American Foam Corporation; )
D31. Leggett & Platt, Incorporated; )
D32. L&P Financial Services Co.; )
D33. General Foam Corporation; )
D34. GFC Foam, LLC; )
D35. Foamex LP; )
D36. Foamex International Inc.; )
D37. FMXI, Inc.; )
D38. PMC, Inc.; )
D39. PMC Global, Inc.; )
D40. JBL Incorporated f/k/a James B. Lansing Sound, Incorporated d/b/a JBL Professional; )
D41. Essex Insurance Company; )
D42. Multi-State Inspections, Inc.; )
D43. High Caliber Inspections, Inc.; )
D44. Underwriters at Lloyd's, London; )
D45. Gresham & Associates of R.I., Inc.; )
D46. ABC Bus, Inc. d/b/a ABC Bus Leasing, Inc.; )
D47. Superstar Services LLC; )
D48. through D58. "John Doe" defendants (being unknown defendants who manufactured, distributed, sold or installed non-flame-retardant foam or other defective products in use at The )

Station nightclub on February 20, 2003, who inspected the premises after installation of the foam but prior to February 20, 2003, who promoted, managed and produced the appearance of Great White at The Station nightclub on February 20, 2003, or who received property from Triton Realty-related persons or entities with intent to hinder, delay or default Plaintiffs); )

D59. Surplex Underwriters Inc.; )
D60. V.B. Gifford & Company, Inc.; )
D61. Anchor Solutions Company, Inc.; )
D62. Stephen D. Murray; )
D63. Joseph Lafontaine d/b/a New England Custom Alarms; )
D64. Polar Industries, Inc.; )
D65. Home Depot U.S.A., Inc.; )
D66. Celotex Corp.; )
D67. Knight-Celotex Lisbon Falls LLC; )
D68. Knight-Celotex LLC; )
D69. Knight Industries, Inc. )
D70. Knight Industries, LLC; )
D71. Knight Industries I, LLC; )
D72. FFNC, Inc.; )
D73. Aram Dermanouelian; )
D74. Framingham-150 FR Realty Limited Partnership by Framingham-150 FR Realty, Inc., its general partner; )
D75. Seekonk-226 Limited Partnership by Seekonk-226, Inc., its general partner; )
D76. Frances A. Villanova; )
D77. Busch Entertainment Corporation; )
D78. Busch Media Group, Inc.; )
D79. TVL Broadcasting of Rhode Island, LLC; )
D80. LIN Television Corporation; )
D81. LIN T.V. Corp.; )
D82. Mark Kendall; )
D83. David Felice; )
D84. Eric Powers; )
D85. Wm. T. Burnett & Co., Incorporated; )
D86. Wm. T. Burnett Operating LLLP, by its general partner, Wm. T. Burnett Management, Inc.; )
D87. Wm. T. Burnett Management, Inc.; )
D88. Wm. T. Burnettt & Co.; )
D89. Sealed Air Corp.; )
D90. Sealed Air Corp., U.S.; )
D91. Sentinel Products Corp.; )
D92. Pactiv Corporation; )
D93. Pregis Corporation; )
D94. Pregis Innovative Packaging, Inc.; )
D95. Luna Tech Pyrotechnik GmbH; )
D96. Luna Tech Euro GmbH; )
D97. Gresham & Associates of Rhode Island, Inc. )

Defendants. )

## COMPLAINT AND JURY DEMAND

### Introduction

During the first status conference in this matter on October 26, 2004, the Court expressed its desire that a single Master Complaint be prepared which might be adopted by all claimants in The Station nightclub fire actions. The following is Plaintiffs' latest submission in that regard. It is being filed pursuant to the Consent Order entered by this Court on February 2, 2006.

This complaint seeks monetary damages from those individuals and entities responsible for the conditions and actions which resulted in a fire at The Station nightclub in West Warwick, Rhode Island on February 20, 2003, which claimed 100 lives and caused injury to several hundred individuals.

## PARTIES

### Plaintiff

1. (a) Plaintiff Neil Gonsalves, Administrator, brings this claim on behalf of the Estate and wrongful death beneficiaries of his son, Michael Gonsalves, who lived in Providence, Rhode Island. Derek Gray was lawfully on the premises of The Station nightclub on Cowesett Avenue, West Warwick, RI, on February 20, 2003 and died from injuries sustained in the fire. Neil Gonslaves was dully appointed Administrator of the plaintiff Estate by the Probate Court for the County of Providence.

2. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

3. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

4. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

5. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

6. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

7. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

8. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

9. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

10. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

11. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

12. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

13. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

14. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

15. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

16. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

17. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

18. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

19. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

20. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

21. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

22. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

23. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

24. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

25. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

26. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

27. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

28. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

29. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

30. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

31. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

32. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

33. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

34. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

35. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

36. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

37. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

38. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

39. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

40. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

41. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

42. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

43. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

44. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

45. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

46. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

47. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

48. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

49. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

50. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

51. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

52. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

53. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

54. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

55. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

56. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

57. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

58. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

59. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

60. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

61. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

62. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

63. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

64. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

65. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

66. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

67. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

68. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

69. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

70. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

71. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

72. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

73. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

74. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

75. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

76. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

77. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

78. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

79. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

80. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

81. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

82. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

83. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

84. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

85. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

86. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

87. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

88. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

89. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

90. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

91. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

92. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

93. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

94. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

95. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

96. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

97. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

98. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

99. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

100. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

101. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

102. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

103. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

104. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

105. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

106. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

107. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

108. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

109. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

110. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

111. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

112. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

113. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

114. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

115. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

116. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

117. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

118. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

119. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

120. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

121. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

122. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

123. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

124. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

125. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

126. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

127. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

128. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

129. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

130. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

131. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

132. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

133. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

134. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

135. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

136. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

137. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

138. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

139. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

140. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

141. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

142. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

143. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

144. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

145. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

146. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

147. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

148. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

149. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

150. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

151. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

152. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

153. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

154. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

155. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

156. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

157. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

158. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

159. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

160. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

161. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

162. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

163. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

164. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

165. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

166. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

167. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

168. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

169. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

170. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

171. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

172. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

173. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

174. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

175. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

176. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

177. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

178. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

179. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

180. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

181. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

182. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

183. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

184. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

185. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

186. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

187. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

188. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

189. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

190. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

191. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

192. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

193. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

194. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

195. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

196. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

197. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

198. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

199. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

200. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

201. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

202. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

203. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

204. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

205. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

206. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

207. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

208. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

209. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

210. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

211. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

212. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

213. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

214. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

215. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

216. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

217. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

218. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

219. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

220. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

221. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

222. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

223. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

224. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

225. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

226. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

227. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

228. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

229. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

230. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

231. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

232. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

233. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

234. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

235. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

236. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

237. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

238. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

239. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

240. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

241. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

242. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

243. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

244. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

245. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

246. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

247. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

249. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

250. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

251. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

252. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

253. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

254. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

255. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

256. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

257. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

258. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

259. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

260. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

261. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

262. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

263. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

264. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

265. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

266. Plaintiff omits this paragraph to keep the numbering in conformity with the Third Amended Master Complaint filed in Albert L. Gray, administrator, et al. v. Jeffrey Derderian et al. C.A No.: 04-312-L.

(Plaintiff paragraph numbers 267 through 270 reserved.)

## GENERAL ALLEGATIONS AS TO ALL DEFENDANTS

271. The amount in controversy as to each defendant is sufficient to satisfy the applicable jurisdictional threshold of the Court. Also, all Plaintiff-identifying allegations (paragraphs 1 through 270, inclusive) are incorporated in each Defendant-related count of this Complaint.

## JEFFREY DERDERIAN

272. Plaintiffs repeat and incorporate by reference herein all prior paragraphs of this Complaint.

273. The defendant Jeffrey Derderian is an individual who at times material hereto resided in Narragansett, Washington County, Rhode Island. At times material hereto Jeffrey Derderian acted individually and as an agent of defendant DERCO, LLC and as an agent of either TVL Broadcasting, Inc. ("TVL") or STC Broadcasting, Inc. ("STC").

274. The defendant Jeffrey Derderian was negligent, both individually and as an agent of defendant DERCO, LLC, in the management, maintenance, supervision, control and inspection of The Station. Without limitation, defendant Jeffrey Derderian:

a. contributed to the over-crowding of The Station of February 20, 2003;

b. installed and maintained defective material, including flammable foam and other interior finish, in The Station which caused and contributed to fire spread;

c. failed to ensure compliance with Rhode Island's laws for the permit and use of pyrotechnics;

d. failed to provide numerous fire prevention, detection, and suppression materials at The Station; and

e. failed to provide proper means of egress and adequate and operable lighting to illuminate such means of egress during the fire.

275. Defendant Jeffrey Derderian's negligence, both individually and as an agent of DERCO, LLC caused deaths and severe personal injuries to plaintiffs.

276. On February 20, 2003, Jeffrey Derderian acted at times material hereto as an investigative reporter for WPRI Channel 12, owned by TVL and/or STC. Together with Channel 12 photographer Brian Butler, also employed by TVL and/or STC, Jeffrey Derderian was investigating and preparing an analysis of nightclub safety for his employer intended to be aired in the wake of a fatal Chicago nightclub fire.

277. Jeffrey Derderian knew of several hazardous conditions in The Station nightclub on February 20th prior to 11:00 p.m., including without limitation that the club was substantially overcrowded, that it lacked adequate and lawful egress, that non-flame-retardant and defective egg crate foam had been placed on the interior finish of the walls surrounding the stage where the band would perform, and that Great White would use pyrotechnics in close proximity to these walls.

278. Had Jeffrey Derderian been investigating any other nightclub but one he owned and operated, he would have, armed with this knowledge, brought it to the attention of the owners and operators of the nightclub in an effort to aggressively promote a newsworthy story and/or to promote safety and prevent tragedy.

279. Jeffrey Derderian's failure to call attention to these defects as an individual, as owner of DERCO, LLC, and as an investigative reporter for TVL and/or STC working for WPRI Channel 12, caused deaths of and severe personal injuries to plaintiffs.

**COUNT I**
**JEFFREY DERDERIAN – NEGLIGENCE**

280. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 279 of this Complaint.

281. This Count seeks damages on behalf of all plaintiffs from Jeffrey Derderian arising out of his negligence as an individual, as an agent of DERCO, LLC, and as an agent of TVL and/or STC.

**COUNT II**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

282. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 279 of this Complaint.

283. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**MICHAEL DERDERIAN**

284. The defendant Michael Derderian is an individual who at times material hereto resided in Saunderstown, Washington County, Rhode Island. At times material hereto Michael Derderian acted individually and as an agent of defendant DERCO, LLC.

285. The defendant Michael Derderian was negligent, both individually and as an agent of defendant DERCO, LLC, in the management, maintenance, supervision, control and inspection of The Station. Without limitation, defendant Michael Derderian:

a. contributed to the overcrowding of The Station on February 20, 2003;

b. installed and maintained defective material, including flammable foam and other interior finish, in The Station which caused and contributed to the fire spread;

c. failed to ensure compliance with Rhode Island's laws for the permit and use of pyrotechnics;

d. failed to provide numerous fire prevention, detection and suppression materials at The Station; and

e. failed to provide proper means of egress and adequate and operable lighting to illuminate such means of egress during the fire.

286. Defendant Michael Derderian's negligence, both individually and as an agent of DERCO, LLC, caused deaths of and severe personal injuries to plaintiffs.

**COUNT III**
**MICHAEL DERDERIAN – NEGLIGENCE**

287. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 284 through 286 of this Complaint.

288. This Count seeks damages on behalf of all plaintiffs from Michael Derderian arising out of his negligence as an individual and as an agent of DERCO, LLC.

## COUNT IV
## VIOLATION OF RHODE ISLAND GENERAL LAWS
## TITLE 9, CHAPTER 1, SECTION 2

289. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 284 through 286 of this Complaint.

290. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

## DERCO, LLC

291. The defendant DERCO, LLC is a Rhode Island Corporation with a principal place of business in West Warwick. DERCO, LLC does business as The Station and is owned by defendants Jeffrey Derderian and Michael Derderian.

292. The defendant DERCO, LLC, through its agents, servants and employees, was negligent in the management, maintenance, supervision, control and inspection of The Station, which it owned and operated. DERCO, LLC's negligence included, without limitation:

a. allowing The Station to be overcrowded on February 20, 2003;

b. allowing the installation and maintenance of defective material, including flammable foam and other interior finish, in The Station which caused and contributed to fire spread;

c. failing to ensure compliance with Rhode Island's laws for the permit and use of pyrotechnics;

d. failing to provide numerous fire prevention, detection and suppression materials at The Station; and

e. failing to provide proper means of egress and adequate and operable lighting to illuminate such means of egress during the fire.

293. Defendant DERCO, LLC's negligence caused deaths of and severe personal injuries to plaintiffs.

## COUNT V
## DERCO, LLC – NEGLIGENCE

294. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 291 through 293 of this Complaint.

295. This Count seeks damages on behalf of all plaintiffs from DERCO, LLC arising out of its negligence.

**COUNT VI**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

296. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 291 through 293 of this Complaint.

297. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**HOWARD JULIAN**

298. The defendant Howard Julian is an individual who at times material hereto resided in Hope Valley, Washington County, Rhode Island. At times material hereto Howard Julian acted individually and as an agent and owner of La Villa Strangiato, Inc.

299. From December 5, 1995 through March 7, 2000, the defendant Howard Julian, individually and as an agent and owner of La Villa Strangiato, Inc. negligently managed, maintained, supervised, controlled and inspected premises at 211 Cowesett Avenue, West Warwick, while such premises were being leased from the defendant, Triton Realty Limited Partnership. Julian's negligence included the installation and maintenance of defective material, including interior finish, on the premises, which caused and contributed to fire spread on February 20, 2003. Defendant Howard Julian's negligence, both individually and as an agent of La Villa Strangiato, Inc. caused deaths of and severe personal injuries to plaintiffs.

**COUNT VII**
**HOWARD JULIAN - NEGLIGENCE**

300. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 298 through 299 of this Complaint.

301. This Count seeks damages on behalf of all plaintiffs from Howard Julian arising out of his negligence as an individual and as an agent of La Villa Strangiato, Inc.

**COUNT VIII**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

302. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 298 through 299 of this Complaint.

303. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**TRITON REALTY LIMITED PARTNERSHIP**

304. Triton Realty Limited Partnership is a limited partnership organized under the laws of Massachusetts, registered to do business in and having a principal place of business in Rhode Island. At all relevant times Triton Realty Limited Partnership owned property at 211 Cowesett Avenue, West Warwick, Rhode Island, and leased property to various individuals and entities for the operation of restaurants and nightclubs.

305. As property owner Triton Realty Limited Partnership had an obligation to keep the premises reasonably safe for all persons lawfully on the property. As landlord, Triton Realty Limited Partnership retained the right to approve or reject any and all alterations or repairs made by the tenant. Triton Realty Limited Partnership retained sufficient control over the leased premises to impose upon it a duty to correct defective and nuisance conditions created by tenants both prior to renewal of leases and after lease renewal but prior to the fire of February 20, 2003. Triton Realty Limited Partnership also warranted to its lessees that the leased premises complied with all applicable building, safety and fire regulations as of the date of the lease, giving rise to a duty to make such corrections as were necessary to make the statement true.

306. Triton Realty Limited Partnership breached the aforementioned duties and obligations by negligently failing to correct and remove defective conditions on the premises, including without limitation, defective material installed on the premises, including interior finish, and failing to correct open and obvious building and fire code violations on the premises. Defendant Triton Realty Limited Partnership's negligence caused deaths of and severe personal injuries to plaintiffs.

307. On information and belief, Defendant Triton Realty Limited Partnership has transferred assets with the intent to hinder, delay or defraud Plaintiffs.

**COUNT IX**
**TRITON REALTY LIMITED PARTNERSHIP – NEGLIGENCE**

308. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 304 through 307 of this Complaint.

309. This Count seeks damages on behalf of all plaintiffs from Triton Realty Limited Partnership arising out of its negligence.

**COUNT X**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

310. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 304 through 307 of this Complaint.

311. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**TRITON REALTY, INC.**

312. Triton Realty, Inc. is a corporation organized under the laws of Massachusetts and registered to do business in and having a principal place of business in Rhode Island. At relevant times Triton Realty, Inc. was the General Partner of Triton Realty Limited Partnership, which limited partnership owned property at 211 Cowesett Avenue, West Warwick, Rhode Island and leased the property to various individuals and entities for the operations of restaurants and nightclubs.

313. As general partner of Triton Realty Limited Partnership, Triton Realty, Inc. had an obligation to keep the premises at 211 Cowesett Avenue in West Warwick, Rhode Island reasonably safe for all persons lawfully on the property. As general partner of the landlord, Triton Realty Limited Partnership, Triton Realty, Inc. retained the right to approve or reject any and all alterations or repairs made by the tenant. Triton Realty, Inc., as general partner of Triton Realty Limited Partnership, retained sufficient control over the leased premises to impose upon it a duty to correct defects and nuisance conditions created by tenants both prior to renewal of leases and after lease renewal but prior to the fire of February 20, 2003. Triton Realty, Inc., as general partner of Triton Realty Limited Partnership, warranted to its lessees that the leased premises complied with all applicable building, safety and fire regulations as of the date of the lease, giving rise to a duty to make such corrections as were necessary to make the statement true.

314. Triton Realty, Inc., as general partner of Triton Realty Limited Partnership, breached the aforementioned duties and obligations by negligently failing to correct and remove defective conditions on the premises, including without limitation, defective material installed on the premises, including interior finish, and failing to correct open and obvious building and fire code violations. Defendant Triton Realty, Inc.'s negligence caused deaths of and severe personal injuries to plaintiffs.

315. On information and belief Defendant Triton Realty, Inc. has transferred assets with the intent to hinder, delay or defraud Plaintiffs.

**COUNT XI**
**TRITON REALTY, INC. – NEGLIGENCE**

316. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 312 through 315 of this Complaint.

317. This Count seeks damages on behalf of all plaintiffs from Triton Realty, Inc. arising out of its negligence.

**COUNT XII**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

318. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 312 through 315 of this Complaint.

319. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**RAYMOND J. VILLANOVA**

320. Raymond J. Villanova ("Villanova") is a resident of Warwick, Kent County, Rhode Island. At relevant times Raymond J. Villanova was General Partner of Triton Realty Limited Partnership, the owner of property at 211 Cowesett Avenue, West Warwick, Rhode Island.

321. As general partner of the property owner Triton Realty Limited Partnership, Villanova had an obligation to keep the premises reasonably safe for all persons lawfully on the property. As general partner to the landlord, Triton Realty Limited Partnership, Villanova retained the right to approve or reject any and all alterations or repairs made by the tenant. As general partner of Triton Realty Limited Partnership, Villanova retained sufficient control over the leased premises to impose upon it a duty to correct defects and nuisance conditions created by the tenants both prior to renewal of leased and after lease renewal but prior the fire of February 20, 2003. Raymond J. Villanova, as general partner of Triton Realty Limited Partnership retained sufficient control over the leased premises to impose upon it a duty to correct defects and nuisance conditions created by tenants both prior to renewal of leases and after lease renewal but prior to the fire of February 20, 2003. Raymond J. Villanova, as general partner of Triton Realty Limited Partnership, warranted to its lessees that the leased premises complied with all applicable building, safety and fire regulations as of the date of the lease, giving rise to a duty to make such corrections as were necessary to make the statement true.

322. Villanova as general partner of Triton Realty Limited Partnership breached the aforementioned duties and obligations by negligently failing to correct and remove defective conditions on the premises, including without limitation, defective material installed on the premises, including interior finish, failing to correct open and obvious building and fire code violations. Defendant Villanova's negligence caused deaths of and severe personal injuries to plaintiffs.

323. On information and belief Defendant Villanova has transferred assets with the intent to hinder, delay or defraud Plaintiffs.

**COUNT XIII**
**RAYMOND J. VILLANOVA – NEGLIGENCE**

324. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 320 through 323 of this Complaint.

325. This Count seeks damages on behalf of all plaintiffs from Raymond J. Villanova arising out of his negligence.

**COUNT XIV**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

326. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 320 through 323 of this Complaint.

327. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**JACK RUSSELL**

328. The defendant Jack Russell is a resident of California, and was on February 20, 2003, the lead singer of the Band Great White. Defendant Russell individually managed and controlled many aspects of the Band's performance, including its use of pyrotechnics.

329. The defendant Russell had a duty to exercise reasonable care for the safety of the patrons at The Station nightclub in connection with a concert performed there by Great White on February 20, 2003.

330. The defendant Russell failed to use reasonable care and failed to comply with the laws of the State of Rhode Island including, without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

331. Defendant Jack Russell's failure to use reasonable care and violation of the laws of the State of Rhode Island and the requirements of NFPA 1126 caused deaths of and severe personal injuries to plaintiffs.

**COUNT XV**
**JACK RUSSELL – NEGLIGENCE**

332. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 328 through 331 of this Complaint.

333. This Count seeks damages on behalf of all plaintiffs from Jack Russell arising out of his negligence.

**COUNT XVI**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

334. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 328 through 331 of this Complaint. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**JACK RUSSELL TOURING, INC.**

335. The defendant, Jack Russell Touring, Inc. is a California corporation that employed Jack Russell and other members of the band Great White in February of 2003. Jack Russell Touring, Inc. managed and controlled many aspects of the band Great White's performance, including its use of pyrotechnics. Jack Russell Touring, Inc. had a duty to exercise reasonable care for the safety of the patrons of The Station and a duty to comply with the laws of Rhode Island in connection with a concert performed by Great White at The Station on February 20, 2003.

336. The defendant Jack Russell Touring, Inc. failed to use reasonable care and failed to comply with the laws of the State of Rhode Island, including without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

337. Additionally, Defendant Jack Russell Touring, Inc., through its agents, servants and employees, transported more than 25 kilograms of explosive material (fireworks) in interstate commerce and into Rhode Island without registration or permit, state or federal, allowing same to be used by unlicensed persons in close proximity to the public, within a confined, highly flammable space.

338. Said actions by Jack Russell Touring, Inc. were negligent and in violation of state and federal laws, including but not limited to R.I.G.L. Title 11, Chapter 13, Section 8 and 49 C.F.R. §107.601(a)(2).

339. Plaintiffs bring the following claims under common law of negligence and under R.I.G.L. §9-1-2. The negligence and violations of criminal law by Jack Russell Touring, Inc. were a proximate cause of Plaintiffs' deaths and injuries.

**COUNT XVII**
**JACK RUSSELL TOURING, INC. – NEGLIGENCE**

340. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 335 through 339 of this Complaint.

341. This Count seeks damages on behalf of all plaintiffs from Jack Russell Touring, Inc. arising out of its negligence.

**COUNT XVIII**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

342. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 335 through 339 of this Complaint.

343. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**PAUL WOOLNOUGH**

344. The defendant Paul Woolnough is a resident of the State of California, and a principal of Knight Records, Inc. and Manic Music Management, Inc. The defendant Woolnough, individually and through Knight Records, Inc. and Manic Music Management, Inc. managed and controlled many aspects of the band Great White's performance on February 20, 2003, including its use of pyrotechnics.

345. The defendant Paul Woolnough had a duty to exercise reasonable care for the safety of patrons of The Station nightclub and to comply with the laws of Rhode Island in connection with a concert performed at The Station by Great White on February 20, 2003.

346. The defendant Paul Woolnough failed to use reasonable care and failed to comply with the laws of the State of Rhode Island, including without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

347. Defendant Paul Woolnough's negligence, both individually and as an agent of Knight Records, Inc. and Manic Music Management, Inc., caused deaths of and severe personal injuries to plaintiffs.

**COUNT XIX**
**PAUL WOOLNOUGH – NEGLIGENCE**

348. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 344 through 347 of this Complaint.

349. This Count seeks damages on behalf of all plaintiffs from Paul Woolnough arising out of its negligence.

**COUNT XX**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

350. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 344 through 347 of this Complaint.

351. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**MANIC MUSIC MANAGEMENT, INC.**

352. The defendant Manic Music Management, Inc. is a corporation organized under the laws of California. At relevant times the defendant Manic Music Management, Inc. managed and controlled many aspects of the band Great White's performance, including its use of pyrotechnics.

353. The defendant Manic Music Management, Inc. had a duty to exercise reasonable care for the safety of patrons of The Station and comply with the laws of Rhode Island in connection with a concert performed at The Station on February 20, 2003 by Great White.

354. The defendant Manic Music Management, Inc. failed to use reasonable care and failed to comply with the laws of the State of Rhode Island, including without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

355. Defendant Manic Music Management's negligence caused deaths of and severe personal injuries to plaintiffs.

**COUNT XXI**
**MANIC MUSIC MANAGEMENT, INC. – NEGLIGENCE**

356. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 352 through 355 of this Complaint.

357. This Count seeks damages on behalf of all plaintiffs from Manic Music Management, Inc. arising out of its negligence.

**COUNT XXII**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

358. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 352 through 355 of this Complaint.

359. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**KNIGHT RECORDS, INC.**

360. The defendant Knight Records, Inc. is a corporation organized under the laws of California. At relevant times Knight Records, Inc. managed and controlled many aspects of the band Great White's performance, including its use of pyrotechnics.

361. The defendant Knight Records, Inc. had a duty to exercise reasonable care for the safety of patrons at The Station and to comply with the laws of Rhode Island in connection with a concert performed at The Station by Great White on February 20, 2003.

362. The defendant Knight Records, Inc. failed to exercise reasonable care and failed to comply with the laws of the State of Rhode Island, including without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

363. Defendant Knight Records, Inc.'s negligence caused deaths of and severe personal injuries to plaintiffs.

**COUNT XXIII**
**KNIGHT RECORDS, INC. – NEGLIGENCE**

364. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 360 through 363 of this Complaint.

365. This Count seeks damages on behalf of all plaintiffs from Knight Records, Inc. arising out of its negligence.

**COUNT XXIV**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

366. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 360 through 363 of this Complaint.

367. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**DANIEL BIECHELE**

368. The defendant Daniel Biechele is a resident of the State of California and was at relevant times tour manager of the band Great White and agent for Knight Records, Inc., Manic Music Management, Inc. and Jack Russell Touring, Inc.

369. The defendant Daniel Biechele had a duty to exercise reasonable care for the safety of patrons at The Station and to comply with the laws of Rhode Island in connection with a concert performed at The Station by Great White on February 20, 2003.

370. The defendant Daniel Biechele was negligent in the ignition of pyrotechnics before a proximate audience, failed to exercise reasonable care and failed to comply with the laws of the State of Rhode Island, including without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

371. Defendant, Daniel Biechele's negligence, both individually and as an agent of Jack Russell Touring, Inc., Knight Records, Inc., and Manic Music Management, Inc. caused deaths of and severe personal injuries to plaintiffs.

**COUNT XXV**
**DANIEL BIECHELE – NEGLIGENCE**

372. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 368 through 371 of this Complaint.

373. This Count seeks damages on behalf of all plaintiffs from Daniel Biechele arising out of his negligence as an individual, and as an agent of Jack Russell Touring, Inc., Knight Records, Inc. and Manic Music Management, Inc.

**COUNT XXVI**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

374. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 368 through 371 of this Complaint.

375. Several of Defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**ANHEUSER-BUSCH, INCORPORATED and ANHEUSER-BUSCH COMPANIES, INCORPORATED**

376. The defendants Anheuser-Busch, Incorporated and Anheuser-Busch Companies, Incorporated (hereinafter collectively "Anheuser-Busch") are foreign corporations with a principal place of business in St. Louis, Missouri. Anheuser-Busch is registered to do business in Rhode Island and conducts business in Rhode Island both independently and through an exclusive distributing agency, defendant McLaughlin & Moran, Inc.

377. Defendant Anheuser-Busch owns the registered trademark "Budweiser" and through written and verbal agreements with agents such as McLaughlin & Moran, Inc. grants the right to use the Budweiser trademark under circumstances which Anheuser-Busch controls. These circumstances include, upon information and belief, the requirement that Anheuser-Busch's trademark Budweiser not be used for or in support of or in sponsorship or promotion of an illegal activity.

378. Anheuser-Busch derives direct and indirect economic benefit from the use of the Budweiser trademark in circumstances where Anheuser-Busch can promote brand awareness, and encourage consumption of Budweiser and other Anheuser-Busch products. These circumstances include the use of the Budweiser trademark to invite individuals to crowded clubs, to concerts, and to places of public assembly where target age-groups gather that are known and predicted by Anheuser-Busch to consume its products.

379. Anheuser-Busch had or should have had at all material times a special awareness of the need to regulate and insure the safe use of pyrotechnic special effects at indoor locations. Senior officials of Anheuser-Busch serve as members and alternates on the Technical Committee on Special Effects, the drafter of NFPA 1126, the national standard for the use of pyrotechnics before a proximate audience.

380. By early January 2003, Anheuser-Busch, directly and through its agent McLaughlin & Moran, Inc., had determined that it would grant the use of the trademark Budweiser to promote, sponsor and endorse a concert by the heavy metal band Great White at The Station in West Warwick, Rhode Island on February 20, 2003. Anheuser-Busch agreed to do this by:

a. advertising its promotion and sponsorship in print and on the radio;

b. printing a banner which announced the concert and expressly invited patrons to "party with Budweiser" and hanging it outside the concert venue days prior to February 20, 2003;

c. determining and advertising that it would specifically distribute Budweiser product that was bottled, or "born on," the date of the concert, February 20, 2003 and delivering said beer to The Station on 2/20/03;

d. distributing hats, tee shirts and other Budweiser products within the concert venue at The Station during the concert on February 20, 2003;

e. meeting with others who were promoting the concert, including the club owners and operators, officials and employees of the radio station WHJY and its parent Clear Channel, Inc., and coordinating the timing of these promotional activities prior to and during the concert of February 20, 2003.

381. Anheuser-Busch knew or should have known that the concert that it promoted involved a band that customarily utilized pyrotechnics, and that Great White had repeatedly, openly and illegally used unlicensed pyrotechnics on its tour on numerous occasions prior to February 20, 2003. Minimal inquiry by Anheuser-Busch would have disclosed the inherently dangerous nature of the band's performance, a performance that began with the setting off of illegal fireworks.

382. By virtue of these special circumstances, Anheuser-Busch owed a duty as a promoter and sponsor of the concert Great White was to perform in West Warwick at The Station on February 20, 2003, to make that minimal inquiry sufficient to discover the dangers of the band's performance. Additionally, Anheuser-Busch's allowing use of the "Budweiser" trademark without making such minimal inquiry into the quality or safety of the product or services associated with it constituted naked licensing of the mark which deceived or tended to deceive the public, including Plaintiffs.

383. This duty derived from their special role in supporting and promoting the concert, and from their superior knowledge of the dangers of improperly licensed and regulated proximate pyrotechnics in this setting.

384. Anheuser-Busch breached their duty to patrons at the Great White concert at The Station in West Warwick on February 20, 2003, and their negligence caused deaths of and severe personal injuries to plaintiffs. Moreover, Anheuser-Busch's actions substantially contributed to the unlawful and dangerous overcrowding of the premises, and to the patrons' difficulties in escaping the burning building.

**COUNT XXVII**
**ANHEUSER-BUSCH – NEGLIGENCE**

385. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 376 through 384 of this Complaint.

386. This Count seeks, on behalf of all plaintiffs, damages from Anheuser-Busch arising out of its negligence as an entity and through its agent, McLaughlin & Moran, Inc.

**McLAUGHLIN & MORAN**

387. McLaughlin & Moran, Inc. is a Rhode Island corporation with a principal place of business in Cranston, County of Providence, Rhode Island. At all relevant times McLaughlin & Moran, Inc. was the

exclusive distributor for Anheuser-Busch in Rhode Island, acting as its agent with respect to all matters, including without limitation, agreements for the use of the Budweiser trademark owned by Anheuser-Busch.

388. By early January 2003, McLaughlin & Moran, Inc., acting individually and as the agent of Anheuser-Busch, determined that it would grant the use the trademark Budweiser to promote, sponsor and endorse a concert by the heavy metal band Great White at The Station in West Warwick, Rhode Island on February 20, 2003. McLaughlin & Moran, Inc. agreed to do this by:

a. advertising its promotion and sponsorship in print and on the radio on behalf of Budweiser;

b. printing a banner which announced the concert and expressly invited patrons to "party with Budweiser" and hanging it outside the concert venue days prior to February 20, 2003;

c. determining and advertising that it would specifically distribute Budweiser product that was bottled, or "born on," the date of the concert, February 20, 2003;

d. providing its employees to distribute tee shirts and other Budweiser products within the concert venue at The Station during the concert on February 20, 2003; and

e. meeting with others who were promoting the concert, including the club owners and operators, officials and employees of the radio station WHJY and its parent Clear Channel, Inc., and coordinating the timing of these promotional activities prior to and during the concert of February 20, 2003.

389. McLaughlin & Moran, Inc., both individually and as the agent of Anheuser-Busch, knew or should have known that the concert that it chose to promote involved a band that customarily utilized pyrotechnics, and that Great White had repeatedly, openly and illegally used unlicensed pyrotechnics on its tour on numerous occasions prior to February 20, 2003. Minimal inquiry by McLaughlin & Moran, Inc., individually and as agent of Anheuser-Busch, would have disclosed the inherently dangerous nature of the band's performance, a performance that began with the setting off of illegal fireworks.

390. By virtue of these special circumstances, McLaughlin & Moran, Inc., both individually and as agent of Anheuser-Busch, owed a duty as a promoter and sponsor of the concert Great White was to perform in West Warwick at The Station on February 20, 2003, to make that minimal inquiry sufficient to discover the dangers of the band's performance. Additionally, McLaughlin & Moran, Inc.'s allowing use of the "Budweiser" trademark without making such minimal inquiry into the quality or safety of the product or services associated with it constituted naked licensing of the mark which deceived or tended to deceive the public, including Plaintiffs.

391. This duty derived from the special role that McLaughlin & Moran, individually and as agent of Anheuser-Busch played in supporting and promoting the concert, and from the superior

knowledge of Anheuser-Busch relating to the dangers of improperly licensed and regulated proximate pyrotechnics in this setting.

392. McLaughlin & Moran, Inc. breached their duty to patrons of the Great White concert at The Station in West Warwick on February 20, 2003, and their negligence caused deaths of and severe personal injuries to plaintiffs.

**COUNT XXVIII**
**McLAUGHLIN & MORAN, INC. – NEGLIGENCE**

393. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 387 through 392 of this Complaint.

394. This Count seeks, on behalf of all plaintiffs, damages from the defendant McLaughlin & Moran, Inc., both individually and as an agent of Anheuser-Busch.

**WHJY, INC. AND CAPSTAR RADIO OPERATING COMPANY**

395. This count has been intentionally omitted.

396. This count has been intentionally omitted.

397. This count has been intentionally omitted.

398. This count has been intentionally omitted.

399. This count has been intentionally omitted.

400. This count has been intentionally omitted.

401. This count has been intentionally omitted.

402. This count has been intentionally omitted.

**COUNT XXIX**
**WHJY, INC. AND/OR CAPSTAR – NEGLIGENCE**

403. This count has been intentionally omitted.

404. This count has been intentionally omitted.

**CLEAR CHANNEL BROADCASTING, INC.**

405. This count has been intentionally omitted.

406. This count has been intentionally omitted.

407. This count has been intentionally omitted.

408. This count has been intentionally omitted.

**COUNT XXX**
**CLEAR CHANNEL BROADCASTING, INC. – NEGLIGENCE**

409. This count has been intentionally omitted.

410. This count has been intentionally omitted.

**DENIS P. LAROCQUE, ANTHONY BETTENCOURT AND MALCOLM MOORE , IN HIS CAPACITY AS FINANCE DIRECTOR OF THE TOWN OF WEST WARWICK**

411. The defendant Denis Larocque is a resident of West Warwick, Kent County, Rhode Island and is and was at relevant times Fire Inspector for the Town of West Warwick and responsible for enforcement of fire safety laws in the Town.

412. Defendant Anthony Bettencourt is an individual who, at all times material hereto, was employed as a police officer by the Town of West Warwick, Rhode Island.

413. Malcolm Moore is Finance Director of the Town of West Warwick, a municipal corporation organized and existing under the laws of the State of Rhode Island.

414. Denis Larocque as Fire Inspector was responsible for inspecting commercial structures in the Town of West Warwick and for enforcing the fire code and building laws of the State of Rhode Island within West Warwick.

415. Denis Larocque, Fire Inspector, negligently failed to properly inspect the premises at 211 Cowesett Avenue in West Warwick, Rhode Island at various times prior to February 20, 2003; additionally, said inspections were relied upon by the owners of The Station and of the realty.

416. As a proximate result of Defendant Denis P. Larocque's negligence plaintiffs suffered injuries or death.

417. On February 20, 2003, Anthony Bettencourt was employed as a special detail officer to provide security services, and enforce the law, at The Station nightclub before and during the Great White Concert.

418. Defendant Anthony Bettencourt negligently failed to use reasonable care in carrying out his duties, failed to monitor and enforce occupancy restrictions, and permitted dangerous and unlawful overcrowding of the premises, failed to enforce Rhode Island's laws for the permit and use of pyrotechnics and otherwise negligently failed to perform his functions intended to protect the patrons of The Station, including plaintiffs.

419. As a direct and proximate result of Anthony Bettencourt's negligence plaintiffs suffered injuries or death.

420. The negligence of the Town of West Warwick, by and through its agents, servants and employees, included without limitation:

a. failing to adequately inspect The Station for safety hazards and violations;

b. failing to enforce fire safety laws, regulations and standards;

c. allowing unsafe numbers of persons on the premises during the performance;

d. allowing the use of dangerous pyrotechnic devices during performances at The Station;

e. allowing a public nuisance and a fire hazard to exist for an unreasonable period of time, namely, The Station nightclub;

f. failing to provide sufficient security and fire protection for a function at which they knew or should have known large numbers of people would be in attendance;

g. knowing of numerous dangerous conditions and fire hazards at The Station and failing to remedy those conditions or ordering them to be remedied;

h. failing to protect members of the public for the foreseeable risk of serious injury or death at The Station;

i. failing to adequately oversee, supervise, monitor, evaluate, train and/or retrain those performing inspections of The Station;

j. through the actions and inactions of its "detail policeman" Anthony Bettencourt who was performing a non-governmental function typically performed by private security services on the night of the fire, allowing (a) through (i), above; and

k. responsibility for other acts and failures to act that may become apparent after discovery.

421. The negligence of Denis P. Larocque and the Town of West Warwick was egregious; his actions constituted a lack of good faith performance of his duties.

422. The negligence of Anthony Bettencourt was egregious.

423. The negligence of all other agents, servants and employees of the Town of West Warwick including, without limitation, that of Building Inspector Stephen D. Murray, was egregious.

424. All plaintiffs provided the Town of West Warwick with a Notice of Presentment of Claim, pursuant to Rhode Island General Laws Section 45-15-5.

425. The egregious negligence of the Town of West Warwick through Denis Larocque, and/or Anthony Bettencourt and/or Stephen D. Murray (or other agents, servants or employees) was a proximate cause of plaintiffs' deaths and injuries.

## COUNT XXXI
## MALCOLM MOORE IN HIS CAPACITY AS FINANCE DIRECTOR OF THE TOWN OF WEST WARWICK – NEGLIGENCE

426. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 411 through 425 of this Complaint.

427. This Count seeks, on behalf of all plaintiffs, damages from Malcolm Moore in his capacity as Finance Director of the Town of West Warwick for the town's negligence.

**COUNT XXXII**
**DENIS P. LAROCQUE, FIRE INSPECTOR – NEGLIGENCE**

428. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 411 through 425 of this Complaint.

429. This Count seeks, on behalf of all plaintiffs, damages from Denis Larocque, Fire Inspector of the Town West Warwick, individually and in his official capacity, arising out of his negligence.

**COUNT XXXIII**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

430. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 411 through 425 of this Complaint.

431. Several of Defendant Larocque's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**COUNT XXXIV**
**ANTHONY BETTENCOURT – NEGLIGENCE**

432. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 411 through 425 of this Complaint.

433. This Count seeks, on behalf of all plaintiffs, damages from Anthony Bettencourt individually and in his official capacity for his negligence.

**STATE OF RHODE ISLAND AND**
**IRVING J. OWENS, FIRE MARSHAL**

434. The defendant, State of Rhode Island, is a body politic and through its Fire Marshal, Irving J. Owens, is directly responsible for the enactment and enforcement of fire safety laws within the State of Rhode Island. In particular, the State of Rhode Island and Irving J. Owens, Fire Marshal are responsible for inspecting commercial structures such as The Station in the Town of West Warwick and for enforcing fire code and building code laws of the State of Rhode Island with respect to said structures.

435. The State of Rhode Island and Fire Marshal Irving J. Owens negligently and carelessly failed to properly inspect The Station and enforce the laws of the State of Rhode proximately causing injuries and deaths to plaintiffs. Such negligence included failing to enforce appropriate capacity limitations and exit requirements, failing to discover and order remedied highly flammable interior finish within the building and failing to properly train and supervise state personnel responsible for enforcing the fire safety laws of Rhode Island.

436. The negligence of the State of Rhode Island and Irving J. Owens, Fire Marshal, was egregious.

**COUNT XXXV**
**STATE OF RHODE ISLAND – NEGLIGENCE**

437. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 434 through 436 of this Complaint.

438. This Count seeks, on behalf of all plaintiffs, damages from the State of Rhode Island arising out of its egregious negligence.

**COUNT XXXVI**
**IRVING J. OWENS – NEGLIGENCE**

439. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 434 through 436 of this Complaint.

440. This Count seeks, on behalf of all plaintiffs, damages from Irving J. Owens, individually and in his official capacity, arising from his egregious negligence.

**BRIAN BUTLER**

441. The defendant Brian Butler is a resident of Rhode Island. Butler was on February 20, 2003 an employee of either TVL Broadcasting, Inc. or STC Broadcasting, Inc. which owned WPRI Channel 12.

442. On February 20, 2003, Brian Butler, at the direction of Jeffrey Derderian, a Channel 12 investigative reporter for WPRI, and in the course of his employment with WPRI Channel 12 and TVL and/or STC, was acting as a cameraman and filming within The Station and documenting its condition and operation as a nightclub. At relevant times Butler was directed by Derderian in the course of his employment as to what and where he should film with a large videocamera with an attached lighting source.

443. Butler filmed both before and after the instant when the fire ignited polyurethane foam on the stage of The Station. Rather than leaving the building, or assisting patrons of The Station to escape, Butler stood within the building, directly in an egress route, and filmed distressed patrons trying to leave the nightclub. Butler's actions directly impeded the exit of patrons and contributed to the slowdown, backup and additional log jam for those attempting to leave through the main exit.

444. Defendant Brian Butler's negligence, both individually and as an employee of TVL and/or STC, caused deaths of and severe personal injuries to plaintiffs.

**COUNT XXXVII**
**BRIAN BUTLER – NEGLIGENCE**

445. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 441 through 444 of this Complaint.

446. This Count seeks damages on behalf of all plaintiffs from Brian Butler arising out of his negligence as an individual and agent of TVL and/or STC.

**TVL BROADCASTING, INC.**

447. The defendant TVL Broadcasting, Inc. ("TVL") is a corporation doing business in Rhode Island as WPRI-Channel 12.

448. At relevant times TVL employed defendant Jeffrey Derderian as an investigative reporter and defendant Brian Butler as a cameraman.

449. The defendant TVL is vicariously responsible for the actions of defendant Butler and defendant Derderian on February 20, 2003, performed in the course of their employment for TVL and WPRI Channel 12.

450. Defendant TVL's negligence, by and through the actions of its agents, servants and employees Jeffrey Derderian and Brian Butler, caused deaths of and severe personal injuries to plaintiffs.

**COUNT XXXVIII**
**TVL BROADCASTING, INC. – NEGLIGENCE**

451. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 279, 441 through 444 and 447 through 450 of this Complaint.

452. This Count seeks damages on behalf of all plaintiffs from TVL arising out of its negligence.

**STC BROADCASTING, INC.**

453. STC Broadcasting, Inc. ("STC") is a corporation doing business in Rhode Island as WPRI – Channel 12.

454. At relevant times STC employed defendant Jeffrey Derderian as an investigative reporter and defendant Brian Butler as cameraman.

455. Defendant STC is vicariously responsible for the actions of defendant Butler and defendant Derderian on February 20, 2003, performed in the course of their employment.

456. Defendant STC's negligence, by and through the actions of its agents, servants and employees Butler and Derderian caused deaths of and personal injuries to plaintiffs.

**COUNT XXXIX**

**STC BROADCASTING, INC. – NEGLIGENCE**

457. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 279, 441 through 444 and 453 through 456 of this Complaint.

458. This Count seeks damages on behalf of all plaintiffs from STC Broadcasting, Inc. arising out of its negligence.

**BARRY H. WARNER**

459. The defendant Barry H. Warner resides in West Warwick, Kent County, Rhode Island.

460. At relevant times defendant Barry H. Warner was acting within the scope of his employment by American Foam Corporation.

461. Defendant Barry H. Warner sold foam plastic, upon information and belief polyurethane foam, as an acoustical foam to defendants Jeffrey Derderian, Michael Derderian and DERCO, LLC to be used at The Station. Such sale took place prior to February 20, 2003.

462. The foam that Warner sold on behalf of American Foam was highly flammable, non-flame-retardant, toxic, inappropriate for acoustical use and inappropriate for interior finish in places of public assembly.

463. Defendant Barry H. Warner negligently expressly or impliedly represented that the foam was safe for its intended purpose and failed to provide appropriate warnings despite his knowledge of the dangerous characteristics of the foam. Defendant Barry H. Warner did all this both as an individual and as an agent, servant or employee of American Foam Corporation.

464. Warner's negligence caused deaths of and severe personal injuries to plaintiffs.

**COUNT XL**
**BARRY H. WARNER – NEGLIGENCE**

465. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 459 through 464 of this Complaint.

466. This Count seeks damages on behalf of all plaintiffs from Barry H. Warner arising out of his negligence.

**COUNT XLI**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

467. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 459 through 464 of this Complaint.

468. Several of defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**COUNT XLII**
**LUNA TECH, INC. – NEGLIGENCE**

469. The defendant Luna Tech, Inc. is an Alabama corporation with a principal place of business at Owens Cross Roads, Alabama, and having sufficient minimum contact with Rhode Island to be subject to this Court's jurisdiction.

470. Luna Tech manufactured the pyrotechnics used by the band Great White at The Station on February 20, 2003.

471. At all material times defendant owed a duty of care to ultimate users or recipients of its pyrotechnics, including plaintiffs, in designing, manufacturing, testing, inspecting, marketing, producing, selling it or distributing the pyrotechnics.

472. The injuries and deaths sustained by plaintiffs were the direct and proximate result of defendant's negligent breach of its duties including but not limited to:

a. failure to use due care in the manufacture, sale or distribution of the pyrotechnics;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the pyrotechnics;

c. failure to otherwise adequately test the pyrotechnics before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the pyrotechnics.

f. failing to provide adequate protection for persons coming into contact with the pyrotechnics, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, labeling, packaging, provision, distribution and/or sale of the pyrotechnics.

**COUNT XLIII**
**LUNA TECH, INC. – STRICT LIABILITY**

473. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 468 through 471 of this Complaint.

474. The pyrotechnics sold and/or distributed by defendant contained defects making them unreasonably dangerous to all actual and potential users or recipients of the pyrotechnics, including plaintiffs.

475. Plaintiffs had no knowledge of the defective condition of the pyrotechnics.

476. The pyrotechnics were in substantially the same condition, when used, as when they left defendant's control.

477. As a direct and proximate result of the failure of the pyrotechnics sold and/or distributed by defendant, plaintiffs suffered death or injuries.

**COUNT XLIV**
**LUNA TECH, INC. – BREACH OF WARRANTY**

478. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 469 through 472.

479. Defendant Luna Tech, Inc. breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said pyrotechnics.

480. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT XLV**
**HIGH TECH SPECIAL EFFECTS, INC. - NEGLIGENCE**

481. The defendant High Tech Special Effects, Inc. is a Tennessee corporation with a principal place of business in Bartlett, Tennessee and having sufficient minimum contact with Rhode Island to be subject to this Court's jurisdiction.

482. High Tech Special Effects, Inc. sold to Great White the pyrotechnics that Great White used at The Station on February 20, 2003.

483. At all material times defendant owed a duty of care to ultimate users or recipients of its pyrotechnics, including plaintiffs, in designing, manufacturing, testing, inspecting, marketing, producing, selling it or distributing the pyrotechnics.

484. The injuries and deaths sustained by plaintiffs were the direct and proximate result of defendant's negligent breach of its duties including but not limited to:

a. failure to use due care in the manufacture, sale or distribution of the pyrotechnics;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the pyrotechnics;

c. failure to otherwise adequately test the pyrotechnics before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the pyrotechnics.

f. failing to provide adequate protection for persons coming into contact with the pyrotechnics, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, labeling, packaging, provision, distribution and/or sale of the pyrotechnics.

**COUNT XLVI**
**HIGH TECH SPECIAL EFFECTS, INC.**
**STRICT LIABILITY**

485. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 481 through 484 of this Complaint.

486. The pyrotechnics sold and/or distributed by defendant contained defects making them unreasonably dangerous to all actual and potential users or recipients of the pyrotechnics, including plaintiffs.

487. Plaintiffs had no knowledge of the defective condition of the pyrotechnics.

488. The pyrotechnics were in substantially the same condition, when used, as when it left defendant's control.

489. As a direct and proximate result of the failure of the pyrotechnics sold and/or distributed by defendant, plaintiffs suffered death or injuries.

**COUNT XLVII**
**HIGH TECH SPECIAL EFFECTS, INC. – BREACH OF WARRANTY**

490. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 481 through 484.

491. Defendant High Tech Special Effects, Inc. breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said pyrotechnics.

492. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT XLVIII**
**AMERICAN FOAM CORPORATION – NEGLIGENCE**

493. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 of this Complaint.

494. Defendant American Foam Corporation is a Rhode Island corporation with a principal place of business in Johnston, Rhode Island.

495. Defendant American Foam Corporation distributed, sold and placed into the stream of commerce a foam plastic which was, upon information and belief, polyurethane foam. American Foam Corporation's employee, Barry H. Warner, acting within the scope of his employment, sold said foam to be used as acoustical interior finish at The Station nightclub. Such sale took place prior to February 20, 2003. The foam that was sold was highly flammable, non-flame-retardant, toxic, inappropriate for use as an acoustical foam and inappropriate for use on interior finish in places of public assembly.

496. Defendant American Foam Corporation, both individually and through its employee Barry Warner, negligently represented that the foam was safe and appropriate for its intended use.

497. At all material times, defendant owed a duty of care to ultimate users or recipients of the foam product, including plaintiffs, in designing, manufacturing, testing, inspecting, marketing, producing, selling and/or distributing the foam product.

498. The injuries and deaths sustained by plaintiffs were the direct and proximate result of defendant's negligent breach of its duties including but not limited to its:

a. failure to use due care in the sale or distribution of the foam product;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product.

**COUNT XLIX**
**AMERICAN FOAM CORPORATION**
**STRICT LIABILITY**

499. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 492 through 497 of this Complaint.

500. The foam product sold and/or distributed by defendant contained defects making it unreasonably dangerous to all actual and potential users or recipients of the foam product, including plaintiffs.

501. Plaintiffs had no knowledge of the defective condition of the foam product.

502. The foam product was in substantially the same condition, when used, as when it left defendant's control.

503. As a direct and proximate result of the failure of the foam product sold and/or distributed by defendant, plaintiffs suffered death or injuries.

**COUNT L**
**AMERICAN FOAM CORPORATION – BREACH OF WARRANTY**

504. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 493 through 498.

505. Defendant American Foam Corporation breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

506. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT LI**
**LEGGETT & PLATT INCORPORATED – NEGLIGENCE**

507. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 513 through 532 of this Complaint.

508. Leggett & Platt Incorporated is a Missouri corporation doing business as Crest-Hood Foam Company, Inc. and Crest Foam.

509. Leggett & Platt designed, manufactured and/or distributed and/or sold foam product to American Foam Corporation, which product caused severe injuries and death to plaintiffs.

510. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

511. The injuries and deaths sustained by plaintiffs were the direct and proximate result of defendant's negligent breach of its duties including, but not limited to, defendant's:

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product.

**COUNT LII**
**LEGGETT & PLATT INCORPORATED**
**STRICT LIABILITY**

512. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 508 through 511 of this Complaint.

513. The foam product sold and/or distributed by defendant Leggett & Platt was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant Leggett & Platt adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including Leggett & Platt has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as Leggett & Platt, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant Leggett & Platt to follow "product stewardship" practices in order to insure that hazardous products

would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. Leggett & Platt had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

514. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

515. Defendant's polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

516. Defendant's polyurethane foam in question contained a design defect that caused plaintiffs harm.

517. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant Leggett & Platt Incorporated.

518. Plaintiffs had no knowledge of the defective condition of the foam product.

519. The extremely hazardous, unreasonably dangerous and defective foam in question was the proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

520. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant Leggett & Platt Incorporated.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. Leggett & Platt should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

521. It was foreseeable to defendant Leggett & Platt that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

522. It was foreseeable to defendant Leggett & Platt that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as Leggett & Platt, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

523. It was foreseeable to Leggett & Platt that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

524. The defendant's defective foam constituted an active hazard, not a passive condition.

525. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

526. But for the defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed, The Station nightclub fire would not have occurred on February 20, 2003.

527. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

528. Defendant's foam in question was not a component part but was an end product itself.

529. Defendant's foam in question was not integrated into any other product.

530. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

531. This integration and defect caused the plaintiffs harm.

532. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT LIII**
**LEGGETT & PLATT INCORPORATED – BREACH OF WARRANTY**

533. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 513 through 532 of this Complaint.

534. Defendant Leggett & Platt Incorporated breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

535. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT LIV**
**L & P FINANCIAL SERVICES CO. – NEGLIGENCE**

536. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 541 through 560 of this Complaint.

537. L&P Financial Services Co. is a Delaware corporation which, in conjunction with defendant Leggett & Platt, sold foam product which injured plaintiffs.

538. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients, and/or people coming in contact with the foam product in the design, manufacture, testing, inspecting, marketing, producing, selling and/or distributing of the foam product.

539. The injuries and death suffered by the plaintiffs were a direct and proximate result of Defendant's negligent breach of its duties including but not limited to Defendant's:

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, provision, distribution and/or sale of the foam product.

**COUNT LV**
**L&P FINANCIAL SERVICES CO. – STRICT LIABILITY**

540. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 537 through 539 of this Complaint.

541. The foam product sold and/or distributed by defendant L&P Financial Services was defective and unreasonably dangerous as designed, manufactured, marketed, sold and distributed for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant L&P Financial Services adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including L&P Financial Services has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as L&P Financial Services Co., have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant L&P Financial Services to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. L&P Financial Services had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

542. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

543. Defendants' polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

544. Defendants' polyurethane foam in question contained a design defect that caused plaintiffs harm.

545. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant L&P Financial Services.

546. Plaintiffs had no knowledge of the defective condition of the foam product.

547. The extremely hazardous, unreasonably dangerous and defective foam in question was the proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

548. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant L&P Financial Services Co.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. L&P Financial Services Co. should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

549. It was foreseeable to defendant L&P Financial Services that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

550. It was foreseeable to defendant L&P Financial Services that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as L&P Financial Services, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

551. It was foreseeable to L&P Financial Services that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

552. The defendant's defective foam constituted an active hazard, not a passive condition.

553. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

554. But for the defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed, The Station nightclub fire would not have occurred on February 20, 2003.

555. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

556. Defendant's foam in question was not a component part but was an end product itself.

557. Defendant's foam in question was not integrated into any other product.

558. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

559. This integration and defect caused the plaintiffs harm.

560. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT LVI**
**L&P FINANCIAL SERVICES CO. – BREACH OF WARRANTY**

561. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 541 through 560 of this Complaint.

562. Defendant L&P Financial Services Co. breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

563. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT LVII**
**GENERAL FOAM CORPORATION – NEGLIGENCE**

564. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 569 through 588 of this Complaint.

565. Defendant General Foam Corporation is a Delaware corporation which manufactured, designed, advertised, marketed, sold or otherwise distributed foam product which injured plaintiffs.

566. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients, and/or people coming in contact with the foam product in the design, manufacture, testing, inspecting, marketing, producing, selling and/or distributing of the foam product.

567. The injuries and deaths suffered by plaintiffs were a direct and proximate result of defendant's negligent breach of its duties including but not limited to defendant's:

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, provision, distribution and/or sale of the foam product.

**COUNT LVIII**
**GENERAL FOAM CORPORATION – STRICT LIABILITY**

568. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 564 through 567 of this Complaint.

569. The foam product sold and/or distributed by defendant General Foam was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant General Foam adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including General Foam has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as General Foam Corporation, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant General Foam to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the

design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. General Foam had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

570. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

571. Defendant's polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

572. Defendant's polyurethane foam in question contained a design defect that caused plaintiffs harm.

573. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant General Foam.

574. Plaintiffs had no knowledge of the defective condition of the foam product.

575. The extremely hazardous, unreasonably dangerous and defective foam in question was the proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

576. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant General Foam Corporation.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. General Foam should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

577. It was foreseeable to defendant General Foam that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

578. It was foreseeable to defendant General Foam that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as General Foam, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

579. It was foreseeable to General Foam that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

580. The defendant's defective foam constituted an active hazard, not a passive condition.

581. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

582. But for the defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed, The Station nightclub fire would not have occurred on February 20, 2003.

583. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

584. Defendant's foam in question was not a component part but was an end product itself.

585. Defendant's foam in question was not integrated into any other product.

586. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

587. This integration and defect caused the plaintiffs harm.

588. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT LIX**
**GENERAL FOAM CORPORATION – BREACH OF WARRANTY**

589. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 569 through 588 of this Complaint.

590. Defendant General Foam Corporation breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

591. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT LX**
**GFC FOAM, LLC – NEGLIGENCE**

592. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 598 through 617 of this Complaint.

593. Defendant GFC Foam, LLC is a Delaware limited liability company which at times material hereto, sold defective foam product which injured plaintiffs to American Foam Corporation.

594. On information and belief GFC Foam LLC designed and manufactured foam product which injured plaintiffs.

595. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients, and/or people coming in contact with the foam product in the design, manufacture, testing, inspecting, marketing, producing, selling and/or distributing of the foam product.

596. The injuries and deaths suffered by plaintiffs were a direct and proximate result of defendant's negligent breach of its duties including but not limited to defendant's:

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, provision, distribution and/or sale of the foam product.

**COUNT LXI**
**GFC FOAM, LLC – STRICT LIABILITY**

597. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 593 through 596 of this Complaint.

598. The foam product sold and/or distributed by defendant GFC Foam, LLC was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant GFC Foam adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including GFC Foam has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as GFC Foam, LLC, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant GFC Foam to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. GFC Foam had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

599. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

600. Defendant's polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

601. Defendant's polyurethane foam in question contained a design defect that caused plaintiffs harm.

602. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant GFC Foam.

603. Plaintiffs had no knowledge of the defective condition of the foam product.

604. The extremely hazardous, unreasonably dangerous and defective foam in question was the proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

605. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant GFC Foam, LLC.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. GFC Foam should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

606. It was foreseeable to defendant GFC Foam that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

607. It was foreseeable to defendant GFC Foam that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as GFC Foam, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

608. It was foreseeable to GFC Foam that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

609. The defendant's defective foam constituted an active hazard, not a passive condition.

610. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

611. But for the defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed, The Station nightclub fire would not have occurred on February 20, 2003.

612. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

613. Defendant's foam in question was not a component part but was an end product itself.

614. Defendant's foam in question was not integrated into any other product.

615. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

616. This integration and defect caused the plaintiffs harm.

617. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT LXII**
**GFC FOAM, LLC – BREACH OF WARRANTY**

618. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 598 through 617 of this Complaint.

619. Defendant GFC Foam, LLC breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

620. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT LXIII**
**FOAMEX LP – SUCCESSOR LIABILITY FOR GENERAL FOAM CORPORATION**

621. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 564 through 591 of this Complaint.

622. Defendant Foamex LP is a Delaware limited partnership and is the successor entity to General Foam Corporation and is legally responsible to respond to plaintiff's claims in this action against General Foam Corporation.

**COUNT LXIV**
**FOAMEX INTERNATIONAL INC. – LIABILITY FOR FOAMEX LP**

623. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 621 through 622 of this Complaint.

624. Foamex International Inc. is a Delaware corporation which, on information and belief, is a general partner, and owns 100% of defendant Foamex LP.

625. Foamex International Inc. so dominates and controls the affairs of Foamex LP that it acts as the alter ego of Foamex LP and is responsible to plaintiffs to respond to their claims in this action.

**COUNT LXV**
**FMXI, INC. – LIABILITY AS GENERAL PARTNER**

626. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 621 through 622 of this Complaint.

627. Defendant FMXI, Inc. is, on information and belief, a corporation organized in the State of Delaware and at times material hereto, was the managing general partner of Foamex LP.

628. FMXI, Inc., as general partner, is responsible for the liability of Foamex LP and is legally responsible to respond to plaintiffs' claims in this action.

**COUNT LXVI**
**PMC, INC.**

629. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 564 through 591 of this Complaint.

630. Defendant PMC, Inc. is, on information and belief, a Delaware corporation, a subsidiary of PMC Global, Inc., and, on information and belief, the parent company of General Foam Corporation.

631. Defendant PMC, Inc. so dominated and controlled the affairs of General Foam Corporation to make it legally responsible for the actions of General Foam Corporation as alleged in this complaint.

**COUNT LXVII**
**PMC GLOBAL, INC.**

632. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 629 through 631 of this Complaint.

633. Defendant PMC Global, Inc. is a Delaware corporation which, on information and belief, owns 100% of the capital stock of PMC, Inc.

634. Defendant PMC Global, Inc. so dominated and controlled the affairs of its wholly owned subsidiary, PMC, Inc. to make it legally responsible to respond the plaintiffs for the claims asserted in this complaint.

**COUNT LXVIII**
**JBL INCORPORATED f/k/a James B. Lansing Sound, Incorporated d/b/a JBL Professional - NEGLIGENCE**

635. JBL Incorporated, formerly known as James B. Lansing Sound, Incorporated d/b/a JBL Professional (hereinafter "JBL"), is a foreign corporation duly organized and existing under the laws of the State of Delaware, and has sufficient minimum contacts with Rhode Island to be subject to this Court's jurisdiction.

636. At all times material hereto on and prior to February 20, 2003, JBL through its agents, employees, and/or assigns was in the business of designing, manufacturing, testing, inspecting, marketing, producing, distributing, and selling encased electronic devices utilized for the amplification of sound (hereinafter "Amplifiers") and intended, at least in part, for use in various venues of public assembly.

637. At all times material hereto on and prior to February 20, 2003, JBL knew or should have known of the use of said amplifiers and speakers as stage furnishings in close proximity to performers

and members of the general public and of the dangerous characteristics and properties of materials contained in and on such amplifiers and speakers.

638. At all times material hereto on and prior to February 20, 2003, JBL owed a duty to purchasers, users and to persons for whom exposure to said amplifiers and speakers was reasonably foreseeable, to exercise due care in the design, manufacture, testing, inspection, marketing, production, distribution and sale of said amplifiers.

639. The injuries and deaths suffered by plaintiffs were a direct and proximate result of defendant's negligent breach of its duties including but not limited to defendant's:

a. failure to use due care in the manufacture, sale or distribution of the amplifiers;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the amplifiers;

c. failure to otherwise adequately test the amplifiers before providing them, distributing them or selling them;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the product.

f. failing to provide adequate protection for persons coming into contact with the product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, provision, distribution and/or sale of the product.

640. On or about February 20, 2003, Plaintiffs and/or decedents were exposed to the dangerous characteristics and properties of said amplifiers/speakers in the combustion of, inter alia, highly flammable foam on and within the speakers.

641. Plaintiffs and/or decedents were at all times material hereto, in the exercise of due care.

642. Prior to February 20, 2003, JBL through its agents and/or employees, breached its said duty owed in that it was negligent in their manner of designing, manufacturing, testing, inspecting, marketing, producing, distributing and selling said amplifiers/speakers.

643. As a direct and proximate result of the negligence of JBL and/or its agents, employees, and/or assigns, said amplifiers were a proximate cause of the personal injuries of the Plaintiffs and/or deaths of the decedents in the combustion of the so-called Station Nightclub.

**COUNT LXIX**
**JBL INCORPORATED - STRICT LIABILITY**

644. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 635 through 643 of this Complaint.

645. At the time JBL sold and/or distributed said amplifiers they were unreasonably dangerous in their characteristics and properties to all users and/or to all persons for whom exposure to said amplifiers was reasonably foreseeable.

646. At all times material hereto, Plaintiffs and/or the decedents had no knowledge of the said dangerous characteristics and properties of said amplifiers.

647. At all times when said amplifiers were used and/or when those persons and/or Plaintiffs for whom exposure to said amplifiers was reasonably foreseeable, were actually exposed, said amplifiers were in essentially the same condition as when they left the care custody and/or control of JBL.

648. As a direct and proximate result of using and/or being exposed to the dangerous characteristics and properties of said amplifiers, which were sold and/or distributed by JBL, Plaintiffs and/or the decedents suffered severe personal injuries and/or death.

**COUNT LXX**
**JBL INCORPORATED – BREACH OF WARRANTY**

649. Plaintiffs repeat and incorporate by reference paragraphs 1 through 271 and 635 through 643 of this Complaint.

650. Defendant JBL Incorporated breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said amplifiers.

651. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**ESSEX INSURANCE COMPANY, MULTI-STATE INSPECTIONS, INC. AND HIGH CALIBER INSPECTIONS, INC.**

652. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 of this Complaint.

653. The Essex Insurance Company (hereinafter "Essex") is a corporation licensed to sell liability and property and casualty insurance in the State of Rhode Island. It issued a policy of commercial liability insurance number 3CH 0430 to Michael Derderian, effective from March 24, 2002 to March 24, 2003 for The Station at 211 Cowesett Ave., West Warwick.

654. Multi-State Inspections, Inc. (hereinafter "Multi-State") is a corporation organized under the laws of the State of Rhode Island for the business of performing insurance inspections.

655. High Caliber Inspections, Inc. (hereinafter "High Caliber") is a corporation organized under the laws of the State of Rhode Island for the business of performing insurance inspections.

656. At various times, including but not limited to April 4, 1996, March 25, 1998 and October 8, 2002, Essex, through its agents and servants, Multi-State and High Caliber, conducted inspections of the

premises at 211 Cowesett Ave. Essex, Multi-State and High Caliber were negligent in performing said inspections. Their negligence included without limitation:

a. failing to adequately inspect The Station for safety hazards and fire/building code violations;

b. failing to note the presence of highly flammable surface treatments;

c. failing to note the inadequacy of exits;

d. failing to note practices of overcrowding;

e. allowing the use of dangerous pyrotechnic devices during performances at The Station;

f. knowing of numerous dangerous conditions and fire hazards at The Station and failing to remedy those conditions or order the insureds to remedy them;

g. failing to protect members of the public for the foreseeable risk of serious injury or death at The Station;

h. failing to adequately oversee, supervise, monitor, evaluate, train and/or retrain those performing inspections of The Station; and

i. other acts and failures to act that may become apparent after discovery.

657. Defendants Essex, Multi-State and High Caliber, in undertaking to perform said inspections, recognized or should have recognized that the competent performance of the inspections was necessary for the protection of third persons, including Plaintiffs.

658. Essex' insured, Michael Derderian, relied upon the results and recommendations of said negligently performed inspections.

659. The negligence of Essex, Multi-State and High Caliber, and each of them, was a proximate cause of Plaintiffs' deaths and injuries.

## COUNT LXXI
## ESSEX INSURANCE COMPANY – NEGLIGENCE

660. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 653 through 659 of this Complaint.

661. This Count seeks, on behalf of all plaintiffs, damages from Essex Insurance Company for its negligence.

## COUNT LXXII
## MULTI-STATE INSPECTIONS, INC. – NEGLIGENCE

662. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 653 through 659 of this Complaint.

663. This Count seeks, on behalf of all plaintiffs, damages from Multi-State Inspections, Inc. for its negligence.

**COUNT LXXIII**
**HIGH CALIBER INSPECTIONS, INC. – NEGLIGENCE**

664. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 653 through 659 of this Complaint.

665. This Count seeks, on behalf of all plaintiffs, damages from High Caliber Inspections, Inc. for its negligence.

**UNDERWRITERS AT LLOYD'S, LONDON AND**
**GRESHAM & ASSOCIATES OF R.I., INC.**

666. Those Underwriters At Lloyd's, London Subscribing To Policy No. 05409 (hereinafter, "Lloyd's") is a surplus lines insurer approved to issue policies in the State of Rhode Island, having a designated agent for service in Rhode Island, and having sufficient minimum contacts with Rhode Island to be subject to this Court's jurisdiction.

667. Lloyd's issued a policy of liability insurance to Michael Derderian for his business at The Station numbered 05409 and effective March 24, 2000 to March 24, 2001.

668. A Lloyd's syndicate also issued a policy of liability insurance to Michael Derderian for his business at The Station numbered 08209 and effective March 24, 2001 to March 24, 2002.

669. A Lloyd's syndicate had previously issued a policy of liability insurance to Howard Julian d/b/a The Station numbered LJD/SPO164 and effective August 14, 1999 to August 14, 2000 (but cancelled on March 9, 2000).

670. Gresham & Associates of R.I., Inc. (hereinafter "Gresham"), previously known as Excess Insurance Underwriters of R.I., Inc., is a corporation organized under the laws of the State of Rhode Island in the business of selling insurance.

671. At various times, including but not limited to May-June, 2000 Lloyd's, through its agents and servants Excess Insurance Underwriters of R.I., Inc. (and others) conducted inspections of the insured premises.

672. Lloyd's and Gresham (then known as Excess) were negligent in performing said inspections. Their negligence included without limitation:

a. failing to adequately inspect The Station for safety hazards and fire/building code violations;

b. failing to note the presence of highly flammable surface treatments;

c. failing to note the inadequacy of exits;

d. failing to note practices of overcrowding;

e. allowing the use of dangerous pyrotechnic devices during performances at The Station;

f. knowing of numerous dangerous conditions and fire hazards at The Station and failing to remedy those conditions or order the insureds to remedy them;

g. failing to protect members of the public for the foreseeable risk of serious injury or death at The Station;

h. failing to adequately oversee, supervise, monitor, evaluate, train and/or retrain those performing inspections of The Station;

i. other acts and failures to act that may become apparent after discovery.

673. Defendants Lloyd's and Gresham, in undertaking to perform said inspections, recognized or should have recognized that the competent performance of the inspections was necessary for the protection of third persons, including Plaintiffs.

674. Lloyd's and Gresham's insureds, Julian and Derderian, relied upon the results and recommendations of said negligently performed inspections.

675. The negligence of Lloyd's and Gresham, and each of them, was a proximate cause of Plaintiffs' deaths and injuries.

**COUNT LXXIV**
**UNDERWRITERS AT LLOYD'S, LONDON – NEGLIGENCE**

676. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 666 through 675 of this Complaint.

677. This Count seeks, on behalf of all plaintiffs, damages from Underwriters at Lloyd's, London for its negligence.

**COUNT LXXV**
**GRESHAM & ASSOCIATES OF R.I., INC. – NEGLIGENCE**

678. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 666 through 675 of this Complaint.

679. This Count seeks, on behalf of all plaintiffs, damages from Gresham & Associates of R.I., Inc. for its negligence.

**ABC BUS, INC. d/b/a ABC BUS LEASING, INC.**

680. ABC Bus, Inc. (hereinafter "ABC") is a corporation organized under the laws of the state of Missouri, doing business under the assumed name, "ABC Bus Leasing, Inc." and having sufficient contact with the State of Rhode Island to be subject to this Court's jurisdiction. At all times relevant to the

instant case it provided transportation of Great White's personnel and equipment into, and within, the State of Rhode Island. It is a common carrier providing bus transportation in interstate commerce.

681. On or about February 20, 2003 ABC, through its agents, servants and employees, transported more than 25 kilograms of explosive material (fireworks) in interstate commerce and into Rhode Island without registration or permit, state or federal, allowing same to be used by unlicensed persons in close proximity to the public, within a confined, highly flammable space.

682. Said actions by ABC were negligent and in violation of state and federal laws, including but not limited to R.I.G.L. Title 11, Chapter 13, Section 8 and 49 C.F.R. §107.601(a)(2).

683. Plaintiffs bring the following claims under common law of negligence and under R.I.G.L. §9-1-2. The negligence and violations of criminal law by ABC were a proximate cause of Plaintiffs' deaths and injuries.

**COUNT LXXVI**
**ABC BUS, INC. d/b/a ABC BUS LEASING, INC. – NEGLIGENCE**

684. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 680 through 683 of this Complaint.

685. This Count seeks, on behalf of all plaintiffs, damages from ABC Bus, Inc., for its negligence.

**COUNT LXXVII**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

686. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 680 through 683 of this Complaint.

687. Several of defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**SUPERSTAR SERVICES LLC**

688. Defendant Superstar Services LLC (hereinafter "Superstar") is a Delaware limited liability company having sufficient contacts with the State of Rhode Island to be subject to this Court's jurisdiction. At all times relevant to the instant case it provided transportation of Great White's personnel and equipment into, and within, the State of Rhode Island. It is a common carrier providing bus transportation in interstate commerce.

689. On or about February 20, 2003, defendant Superstar, through its agents, servants and employees, transported more than 25 kilograms of explosive material (fireworks) in interstate commerce and into Rhode Island without registration or permit, state or federal, allowing same to be used by unlicensed persons in close proximity to the public, within a confined, highly flammable space.

690. Said actions by Superstar were negligent and in violation of state and federal laws, including but not limited to R.I.G.L. Title 11, Chapter 13, Section 8 and 49 C.F.R. §107.601(a)(2).

691. Plaintiffs bring the following claims under common law of negligence and under R.I.G.L. §9-1-2. The negligence and violations of criminal law by Superstar were a proximate cause of Plaintiffs' death and injuries.

**COUNT LXXVIII**
**SUPERSTAR SERVICES LLC – NEGLIGENCE**

692. Plaintiffs repeat and incorporate by reference paragraphs 1 through 271 and 688 through 691 of this Complaint.

693. This Count seeks, on behalf of all plaintiffs, damages from Superstar Services LLC for its negligence.

**COUNT LXXIX**
**VIOLATION OF RHODE ISLAND GENERAL LAWS**
**TITLE 9, CHAPTER 1, SECTION 2**

694. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 688 through 691 of this Complaint.

695. Several of defendant's actions or omissions constitute the commission of a crime or offense and, accordingly, plaintiffs may recover damages in this action for defendant's actions pursuant to Rhode Island General Laws Title 9, Chapter 1, Section 2.

**COUNT LXXX**
**"JOHN DOE" DEFENDANTS – NEGLIGENCE**

696. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 of this Complaint.

697. "John Doe" defendants are unknown defendants who manufactured, distributed, sold or installed non-flame-retardant foam or other defective products in use at The Station nightclub on February 20, 2003.

698. "John Doe" defendants are, further, unknown defendants who inspected the premises after installation of the foam or other defective products in use at The Station nightclub prior to February 20, 2003.

699. "John Doe" defendants are, further, unknown defendants who promoted, managed, or produced the appearance of Great White at The Station nightclub on February 20, 2003.

700. "John Doe" defendants are, further, unknown defendants who received property from Triton Realty-related persons or entities with intent to hinder, delay or defraud Plaintiffs.

701. "John Doe" defendants, individually and collectively, were negligent and such negligence was a proximate cause of plaintiffs' injuries or death.

**COUNT LXXXI**
**"JOHN DOE" DEFENDANTS – STRICT LIABILITY**

702. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 696 through 701 of this Complaint.

703. The products manufactured, distributed, sold or installed by "John Doe" defendants contained defects making them unreasonably dangerous to all actual and potential users or recipients of the foam products, including plaintiffs.

704. Plaintiffs had no knowledge of the defective condition of the products.

705. The products were in substantially the same condition, when used, as when they left these defendants' control.

706. As a direct and proximate result of the failure of the products plaintiffs suffered death or injuries.

**COUNT LXXXII**
**STATE OF RHODE ISLAND THROUGH DENIS P. LAROCQUE, DEPUTY FIRE MARSHAL**

707. The Defendant, State of Rhode Island, is a body politic and through its fire marshal and deputy fire marshals, it is directly responsible for the enactment and (along with local authorities) enforcement of fire safety laws within the State of Rhode Island. In particular, the State of Rhode Island, through its fire marshal and deputy fire marshals such as Denis P. Larocque, was responsible for inspecting commercial structures such as The Station in the Town of West Warwick and for enforcing fire code and building code laws of the State of Rhode Island with respect to such structures.

708. At all times relevant to the instant count, Denis P. Larocque was a duly appointed deputy fire marshal for the State of Rhode Island and was the agent of the State of Rhode Island (as well as an

agent of the Town of West Warwick). Specifically, the State of Rhode Island, by statute, regulation and otherwise, manifested that Larocque acted for it, Larocque accepted this undertaking and both Larocque and the State agreed that the State would control Larocque's undertakings as its deputy state fire marshal. At all times relevant hereto, Denis P. Larocque was acting within the scope of his agency for the Defendant State of Rhode Island.

709. The State of Rhode Island through its agent, Denis P. Larocque, negligently and carelessly failed to properly inspect The Station and enforce the laws of the State of Rhode Island, proximately causing injuries and deaths to plaintiffs. Such negligence included, without limitation, failing to enforce appropriate capacity limitations and exit requirements, and failing to discover and order remedied highly flammable interior finishes within the building including, but not limited to, polyurethane and polyethylene foams.

710. The negligence of Denis P. Larocque was egregious and, accordingly, the negligence of the State of Rhode Island through its agent Denis P. Larocque was egregious.

711. Larocque's negligence in carrying out his duties as agent for the State of Rhode Island constituted a lack of good faith performance of such duties.

712. This Count seeks, on behalf of all plaintiffs, damages from the State of Rhode Island arising out of its egregious negligence and lack of good faith performance through its agent, Denis P. Larocque.

**COUNT LXXXIII**
**SURPLEX UNDERWRITERS, INC. – NEGLIGENCE**

713. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Surplex Underwriters, Inc. (hereinafter "Surplex") is a corporation organized under the laws of the State of Maine and having sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

714. At various times, including but not limited to April 4, 1996 and March 25, 1998, Surplex, through its agents and servants, conducted inspections of The Station nightclub in conjunction with policies of liability insurance issued to its owner(s) and operators. Surplex and its agents were negligent in performing said inspections. Their negligence included without limitation:

a. failing to adequately inspect The Station for safety hazards and fire/building code violations;

b. failing to note the presence of highly flammable surface treatments;

c. failing to note the inadequacy of exits;

d. failing to note practices of overcrowding;

e. allowing the use of dangerous pyrotechnic devices during performances at The Station;

f. knowing of numerous dangerous conditions and fire hazards at The Station and failing to remedy those conditions or order the insureds to remedy them;

g. failing to protect members of the public for the foreseeable risk of serious injury or death at The Station;

h. failing to adequately oversee, supervise, monitor, evaluate, train and/or retrain those performing inspections of The Station; and

i. other acts and failures to act that may become apparent after discovery.

715. Defendant Surplex, in undertaking to perform said inspections, recognized or should have recognized that the competent performance of the inspections was necessary for the protection of third persons, including Plaintiffs.

716. The applicable insureds, including Howard Julian and Michael Derderian, relied upon the results and recommendations of said negligently performed inspections.

717. The negligence of Surplex was a proximate cause of Plaintiffs' deaths and injuries.

718. This Count seeks, on behalf of all Plaintiffs, damages from Surplex for its negligence.

**COUNT LXXXIV**
**V.B. GIFFORD & COMPANY, INC. – NEGLIGENCE**

719. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant V.B. Gifford & Company, Inc. (hereinafter "Gifford") is a corporation organized under the laws of the Commonwealth of Massachusetts and having sufficient minimum contacts with Rhode Island to be subject to this Court's jurisdiction.

720. At various times, including but not limited to August 27, 1999, Defendant Gifford conducted inspections of The Station nightclub in conjunction with policies of liability insurance issued to its owner(s) and operators. Gifford was negligent in performing said inspections. Its negligence including, without limitation:

a. failing to adequately inspect The Station for safety hazards and fire/building code violations;

b. failing to note the presence of highly flammable surface treatments;

c. failing to note the inadequacy of exits;

d. failing to note practices of overcrowding;

e. allowing the use of dangerous pyrotechnic devices during performances at The Station;

f. knowing of numerous dangerous conditions and fire hazards at The Station and failing to remedy those conditions or order the insureds to remedy them;

g. failing to protect members of the public for the foreseeable risk of serious injury or death at The Station;

h. failing to adequately oversee, supervise, monitor, evaluate, train and/or retrain those performing inspections of The Station; and

i. other acts and failures to act that may become apparent after discovery.

721. Defendant Gifford, in undertaking to perform said inspections, recognized or should have recognized that the competent performance of the inspections was necessary for the protection of third persons, including Plaintiffs.

722. The applicable insureds, including Howard Julian and Michael Derderian, relied upon the results and recommendations of said negligently performed inspections.

723. The negligence of Gifford was a proximate cause of Plaintiffs' deaths and injuries.

724. This Count seeks damages on behalf of all Plaintiffs from Gifford for its negligence.

**COUNT LXXXV**
**ANCHOR SOLUTIONS COMPANY, INC.**
**(PREVIOUSLY ABACUS SERVICE COMPANY, INC.) – NEGLIGENCE**

725. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Anchor Solutions Company, Inc. (hereinafter "Anchor") was known in April, 2000 as Abacus Service Company, Inc. (having undergone a name change on September 15, 2001). It is a Massachusetts corporation having sufficient contact with the State of Rhode Island to be subject to this Court's jurisdiction.

726. On or about April 27, 2000, Anchor, under the name of Abacus Service Company, conducted an inspection of the premises at 211 Cowesett Avenue, West Warwick, Rhode Island, in conjunction with a policy of liability insurance issued to the owner(s) and operators of The Station nightclub. Anchor was negligent in performing said inspection. Its negligence included without limitation:

a. failing to adequately inspect The Station for safety hazards and fire/building code violations;

b. failing to note the presence of highly flammable surface treatments;

c. failing to note the inadequacy of exits;

d. failing to note practices of overcrowding;

e. allowing the use of dangerous pyrotechnic devices during performances at The Station;

f. knowing of numerous dangerous conditions and fire hazards at The Station and failing to remedy those conditions or order the insureds to remedy them;

g. failing to protect members of the public for the foreseeable risk of serious injury or death at The Station;

h. failing to adequately oversee, supervise, monitor, evaluate, train and/or retrain those performing inspections of The Station; and

i. other acts and failures to act that may become apparent after discovery.

727. Defendant Anchor, in performing said inspection, recognized or should have recognized that the competent performance of the inspection was necessary for the protection of third persons, including Plaintiffs.

728. The insured(s) under the policy of insurance referred to above relied upon the results and recommendations of said negligently performed inspection.

729. The negligent of Anchor was a proximate cause of Plaintiffs' deaths and injuries.

730. This Count seeks damages from defendant Anchor arising out of its negligence.

**COUNT LXXXVI**
**STEPHEN D. MURRAY – NEGLIGENCE**

731. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Stephen D. Murray was, at all times relevant to the instant action, the building official for the Town of West Warwick, Rhode Island.

732. Defendant Murray negligently and carelessly failed to properly inspect The Station and enforce the applicable building code(s), proximately causing injuries and deaths to Plaintiffs. Such negligence included failing to enforce appropriate capacity limitations and exit requirements and failing to discover and order remedied highly flammable interior finish within the building.

733. The negligence of Defendant Murray was egregious and constituted a lack of good faith performance of his duties.

734. This Count seeks damages from Defendant Murray, individually, arising out of his conduct which was both negligent and lacking in good faith performance.

**COUNT LXXXVII**
**JOSEPH LAFONTAINE – NEGLIGENCE**

735. Plaintiffs incorporate paragraphs 1 through 271 herein. In or about March, 2000, Defendant Joseph Lafontaine, d/b/a New England Custom Alarms, a resident of Warwick, Rhode Island, was engaged by Howard Julian who was then the operator of The Station to design and install a fire alarm system at The Station nightclub.

736. Defendant Lafontaine knew or reasonably should have known that competent performance of his duties was necessary for the protection of third parties, including Plaintiffs.

737. Howard Julian relied upon the work and recommendations of Defendant Lafontaine.

738. Defendant Lafontaine negligently designed and installed said alarm system. Said negligence included, without limitation, failure to tie the alarm system in to the building's HVAC system, lighting system or sound system in this place of public assembly where loud music would be played.

739. Defendant Lafontaine's negligence was a proximate cause of Plaintiffs' deaths and injuries.

740. This Count seeks damages from Defendant Lafontaine arising out of his negligence.

**COUNT LXXXVIII**
**POLAR INDUSTRIES, INC. – NEGLIGENCE**

741. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Polar Industries, Inc. (hereinafter "Polar") is a corporation organized under the laws of the State of Connecticut and having sufficient minimum contact with Rhode Island to be subject to this Court's jurisdiction.

742. Polar manufactured and sold PolarGuard brand polystyrene insulation which was purchased by Howard Julian, who then operated The Station nightclub, and installed in the exposed ceiling of the drummer's alcove and elsewhere of The Station in early 2000.

743. At all times material hereto, defendant Polar owed a duty of care to ultimate users of, and persons exposed to, its insulation products in designing, manufacturing, testing, inspecting, marketing, producing, selling and distributing said products.

744. Defendant's negligent breach of its duties, including but not limited to

a. failure to use due care in the manufacture, sale or distribution of the insulation;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the insulation;

c. failure to otherwise adequately test the insulation before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards, including but not limited to its unsuitability for use as an exposed interior surface without proper thermal barrier susceptible to exposure to heat or flame;

e. failure to properly and adequately educate users about the use and hazards of the insulation;

f. failing to provide adequate protection for persons coming into contact with the insulation, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, labeling, packaging, provision, distribution and/or sale of the insulation, constituted a proximate cause of Plaintiff's injuries and death.

**COUNT LXXXIX**

**POLAR INDUSTRIES, INC. – STRICT LIABILITY**

745. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 741 through 744 of this Complaint.

746. The insulation sold and/or distributed by defendant was unreasonably dangerous and otherwise defective to all actual and potential users or persons in proximity to the insulation, including Plaintiffs, such that defendant is strictly liable for all deaths and injuries caused thereby.

747. Plaintiffs had no knowledge of the defective condition of the insulation.

748. The insulation was in substantially the same condition, when used, as when it left defendant's control.

749. The defective insulation sold and/or distributed by defendant was a proximate cause of Plaintiffs' deaths and injuries.

**COUNT XC**
**POLAR INDUSTRIES, INC. – BREACH OF WARRANTY**

750. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 741 through 749 of this Complaint.

751. Defendant Polar breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said insulation.

752. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT XCI**
**HOME DEPOT U.S.A., INC. – NEGLIGENCE**

753. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Home Depot U.S.A., Inc. (hereinafter "Home Depot") is a corporation organized under the laws of the State of Delaware and having sufficient minimum contacts with Rhode Island to be subject to this Court's jurisdiction.

754. In or about early 2000, Home Depot sold to Howard Julian, who was then operating The Station, PolarGuard brand polystyrene insulation which was installed on the ceiling of the drummer's alcove and elsewhere in The Station nightclub.

755. In or about 2000, Home Depot also sold to the Derderians Celotex SoundStop board which was installed on the ceiling of the drummer's alcove and elsewhere in The Station nightclub.

756. At all materials times, defendant owed a duty to ultimate users of, or persons exposed to, said insulation, and/or board including Plaintiffs, in testing, inspecting, marketing, producing, selling or distributing the insulation and/or board.

757. Defendant's negligent breach of its duties, including but not limited to

a. failure to use due care in the manufacture, sale or distribution of the insulation and/or board;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the insulation and/or board;

c. failure to otherwise adequately test the insulation and/or board before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product(s) of its (their) potential hazards, including but not limited to its (their) unsuitability for use as an exposed interior surface without proper thermal barrier susceptible to exposure by heat or flame;

e. failure to properly and adequately educate users about the use and hazards of the insulation and/or board;

f. failing to provide adequate protection for persons coming into contact with the insulation and/or board, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, labeling, packaging, provision, distribution and/or sale of the insulation and/or board, constituted a proximate cause of Plaintiffs' injuries and deaths.

**COUNT XCII**
**HOME DEPOT U.S.A., INC. – STRICT LIABILITY**

758. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 753 through 757 of this Complaint.

759. The insulation and/or board sold and/or distributed by defendant was unreasonably dangerous and defective as to all actual and potential users or persons in proximity to the insulation and/or board, including Plaintiffs, such that Defendant is strictly liable for all deaths and injuries caused thereby.

760. Plaintiffs had no knowledge of the defective condition of the insulation and/or board.

761. The insulation and/or board was (were) in substantially the same condition, when used, as when it (they) left defendant's control.

762. The defective insulation and/or board sold and/or distributed by defendant was a proximate cause of Plaintiffs' deaths and injuries.

**COUNT XCIII**
**HOME DEPOT U.S.A., INC. – BREACH OF WARRANTY**

763. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 753 through 762 of this Complaint.

764. Defendant Home Depot breached express and implied warranties of merchantability and fitness in the sale and distribution of said insulation and/or board.

765. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT XCIV**
**CELOTEX SUCCESSORS IN INTEREST – NEGLIGENCE**
**(CELOTEX CORP., KNIGHT-CELOTEX LISBON FALLS LLC, KNIGHT-CELOTEX LLC, KNIGHT INDUSTRIES, INC., KNIGHT INDUSTRIES, LLC AND KNIGHT INDUSTRIES I, LLC)**

766. Plaintiffs incorporate paragraphs 1 through 271 herein. In or about 2000, Celotex Corp., a Delaware corporation, manufactured, sold and distributed Celotex SoundStop board which was sold to the Derderians, who were then the operators of The Station nightclub, by Home Depot and which came to be installed in the ceiling of the drummer's alcove and elsewhere at The Station nightclub.

767. Celotex Corp. has sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

768. Knight-Celotex Lisbon Falls LLC and Knight-Celotex LLC are Illinois limited liability companies. Knight Industries, Inc. is a Delaware corporation. Knight Industries, LLC is an Illinois limited liability company and Knight Industries I, LLC is a Delware limited liability company. All have sufficient contact with the State of Rhode Island to be subject to this Court's jurisdiction.

769. On information and belief, one of Celotex Corp., Knight-Celotex Lisbon Falls LLC, Knight-Celotex LLC, Knight Industries, Inc., Knight Industries, LLC and Knight Industries I, LLC, some combination of them or all of them (hereinafter collectively referred to as "Defendant Celotex" or "defendant"), is/are the successor(s) in interest to Celotex Corp. (or another corporation which sold the SoundStop board) with regard to liabilities arising from the manufacture, sale and distribution of "Celotex SoundStop" board, which product was purchased by the Derderians at Home Depot and installed in the ceiling of the drummer's alcove and elsewhere in The Station nightclub.

770. At all material times, defendant owed a duty to ultimate users of, or persons exposed to, said board, including Plaintiffs, in designing, manufacturing, testing, inspecting, marketing, producing, selling or distributing the board.

771. Defendant's negligent breach of its duties, including but not limited to

a. failure to use due care in the manufacture, sale or distribution of the board;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the board;

c. failure to otherwise adequately test the board before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards, including but not limited to its unsuitability for use as an interior finish in a place of public assembly or as a thermal barrier over highly flammable insulation;

e. failure to properly and adequately educate users about the use and hazards of the board;

f. failing to provide adequate protection for persons coming into contact with the board, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, labeling, packaging, provision, distribution and/or sale of the board, constituted a proximate cause of Plaintiffs' injuries and death.

**COUNT XCV**
**CELOTEX DEFENDANTS – STRICT LIABILITY**

772. In or about 2000, Defendant Celotex (as collectively defined in the previous count) manufactured, sold and distributed Celotex SoundStop board which came to be installed in the ceiling of the drummer's alcove and elsewhere in The Station nightclub.

773. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 767 through 771 of this Complaint.

774. The Celotex SoundStop board sold and/or distributed by defendant was unreasonably dangerous and otherwise defective (including but not limited to defects in warnings and instructions for use) to all actual or potential users or persons in proximity to the board, including Plaintiffs, such that Defendant is strictly liable for all deaths and injuries caused thereby.

775. Plaintiffs had no knowledge of the defective condition of the board.

776. The board was in substantially the same condition, when used, as when it left defendant's control.

777. The defective board sold and/or distributed by defendant was a proximate cause of Plaintiffs' deaths and injuries.

**COUNT XCVI**
**CELOTEX DEFENDANTS – BREACH OF WARRANTY**

778. In or about 2000, Defendant Celotex (as collectively defined in Count XCIV, supra.) manufactured, sold and distributed Celotex SoundStop board which came to be installed in the ceiling of the drummer's alcove at The Station nightclub.

779. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 767 through 777 of this Complaint.

780. Defendant breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said board.

781. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT XCVII**
**FFNC, INC. – NEGLIGENCE**

782. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant FFNC, Inc. (hereinafter "FFNC") is a corporation organized under the laws of the State of Nebraska and having sufficient minimum contacts with the State of Rhode Island to be subject to this Court's jurisdiction.

783. FFNC designed, manufactured and/or distributed and/or sold foam product to American Foam Corporation, which product caused severe injuries and death to Plaintiffs.

784. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including Plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

785. Defendant's negligent breach of its duties, including but not limited to defendant's

a. failure to use due care in the manufacture, sale or distribution of the foam product;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product;

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product, constituted a proximate cause of Plaintiffs' injuries and deaths.

786. The foam product sold and/or distributed by defendant FFNC was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant FFNC adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including FFNC has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as FFNC, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant FFNC to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. FFNC had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

787. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

788. Defendant's polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

789. Defendant's polyurethane foam in question contained a design defect that caused plaintiffs harm.

790. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant FFNC.

791. Plaintiffs had no knowledge of the defective condition of the foam product.

792. The extremely hazardous, unreasonably dangerous and defective foam in question was a proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

793. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant FFNC.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. FFNC should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

794. It was foreseeable to defendant FFNC that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

795. It was foreseeable to defendant FFNC that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as FFNC, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

796. It was foreseeable to FFNC that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

797. The defendant's defective foam constituted an active hazard, not a passive condition.

798. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

799. The defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed was a substantial contributing cause of The Station nightclub fire on February 20, 2003.

800. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

801. Defendant's foam in question was not a component part but was an end product itself.

802. Defendant's foam in question was not integrated into any other product.

803. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

804. This integration and defect were a proximate cause of the plaintiffs' harm.

805. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT XCVIII**
**FFNC, INC. – STRICT LIABILITY**

806. Plaintiffs repeat and incorporate by reference paragraphs 1 through 271 and 782 through 805 of this Complaint.

807. Defendant FFNC, Inc. is liable to Plaintiffs based upon the theory of strict liability.

**COUNT XCIX**
**FFNC, INC. – BREACH OF WARRANTY**

808. Plaintiffs repeat and incorporate by reference paragraphs 1 through 271 and 782 through 805 of this Complaint.

809. Defendant FFNC breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

810. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT C**
**ARAM DERMANOUELIAN – INTENTIONAL TORT**

811. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Aram Dermanouelian is a resident of Jamestown, Rhode Island and was at all times material hereto an officer, employee and shareholder of defendant American Foam Corporation.

812. This defendant instituted and maintained a policy at American Foam Corporation of discouraging and/or prohibiting its employees, including salespeople, from disclosing to American Foam's customers fire risks of foam products of which American Foam was aware.

813. Said actions by this defendant constituted the intentional omission of material facts under circumstances requiring disclosure of such facts.

814. Said intentional actions by this defendant were willful, wanton and reckless.

815. As a result of this policy and the omission of such material facts referred to above, the Derderians who operated The Station nightclub purchased and installed non-fire-retardant-treated foam at The Station nightclub for soundproofing. Defendant Dermanouelian's actions were a proximate cause of deaths and injuries to Plaintiffs.

**COUNT CI**
**ARAM DERMANOUELIAN – NEGLIGENCE**

816. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Dermanouelian negligently instituted a policy which policy resulted in the failure to inform customers of American Foam about fire risks of its foam products.

817. As a proximate result of his negligence, non-fire-retardant-treated foam was sold to and installed at The Station nightclub for soundproofing, all of which was a proximate cause of the deaths and injuries to Plaintiffs.

**COUNT CII**
**FRAMINGHAM-150 FR REALTY LIMITED PARTNERSHIP –**
**FRAUDULENT TRANSFEREE**

818. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Framingham-150 FR Realty Limited Partnership is a Massachusetts limited partnership to whom Defendant Triton Realty

Limited Partnership (owner of The Station nightclub realty at the time of the fire) conveyed valuable commercial real estate, for nominal consideration, on June 13, 2003.

819. Said conveyance was with the intent to hinder, delay or defraud creditors of Triton Realty Limited Partnership, including Plaintiffs who are creditors of Triton Realty Limited Partnership by virtue of the allegations in paragraphs 304 through 319 of this Complaint.

820. Said conveyance must be rescinded in order to effect justice between the parties.

**COUNT CIII**
**FRAMINGHAM-150 FR REALTY, INC. – GENERAL PARTNER OF FRAUDULENT TRANSFEREE**

821. Plaintiffs incorporate paragraphs 1 through 271 herein. Plaintiffs repeat and incorporate by reference paragraphs 818 through 820 of the instant Complaint.

822. Defendant Framingham-150 FR Realty, Inc. is a Massachusetts corporation and the general partner of Framingham-150 FR Realty Limited Partnership. Its president is Michael L. Villanova.

823. This claim is brought to compel Defendant Framingham-150 FR Realty, Inc. to re-convey the subject commercial realty to Triton Realty Limited Partnership.

**COUNT CIV**
**SEEKONK-226 LIMITED PARTNERSHIP – FRAUDULENT TRANSFEREE**

824. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Seekonk-226 Limited Partnership is a Massachusetts limited partnership to whom Defendant Triton Realty Limited Partnership (owner of The Station nightclub realty at the time of the fire) conveyed valuable commercial real estate, for nominal consideration, on June 13, 2003.

825. Said conveyance was with the intent to hinder, delay or defraud creditors of Triton Realty Limited Partnership, including Plaintiffs who are creditors of Triton Realty Limited Partnership by virtue of the allegations in paragraphs 304 through 319 of this Complaint.

826. Said conveyance must be rescinded in order to effect justice between the parties.

**COUNT CV**
**SEEKONK-226, INC. – GENERAL PARTNER OF FRAUDULENT TRANSFEREE**

827. Plaintiffs incorporate paragraphs 1 through 271 herein. Plaintiffs repeat and incorporate by reference paragraphs 824 through 826 of this Complaint.

828. Defendant Seekonk-226, Inc. is a Massachusetts corporation and the general partner of Seekonk-226 Limited Partnership. Its president is Michael L. Villanova.

829. This claim is brought to compel Defendant Seekonk-226 Limited Partnership to re-convey the subject commercial realty to Triton Realty Limited Partnership.

**COUNT CVI**
**FRANCES A. VILLANOVA – FRAUDULENT TRANSFEREE**

830. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Frances A. Villanova is a resident of Lincoln, Rhode Island and the spouse of Defendant Raymond J. Villanova and was the sole transferee on March 13, 2003 of valuable real estate at 16 Dennell Drive, Lincoln, Rhode Island, which had previously been held by Raymond J. Villanova and Frances A. Villanova.

831. Said conveyance was with the intent to hinder, delay or defraud creditors of Raymond J. Villanova, including Plaintiffs who are creditors of Raymond J. Villanova by virtue of the allegations in paragraphs 320 through 327 of this Complaint.

832. Said conveyance must be rescinded in order to effect justice between the parties.

**COUNT CVII**
**BUSCH ENTERTAINMENT CORPORATION – NEGLIGENCE**

833. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Busch Entertainment Corporation (hereinafter "Busch Entertainment") is a corporation organized under the laws of the State of Delaware and having sufficient contact with Rhode island to be subject to this Court's jurisdiction. At all relevant times, it was the agent of Anheuser-Busch, Incorporated and Anheuser-Busch Companies, Incorporated. On information and belief, it is wholly-owned by Defendant Anheuser-Busch Companies, Incorporated, which controls and has imputed knowledge of its day-to-day activities.

834. Busch Entertainment, prior to February 20, 2003, was familiar with the hazards and dangers of the use of the pyrotechnics before proximate audiences and is the arm of defendant, Anheuser Busch Companies, Inc. which participates in studying standards and participating in rule making to address those hazards. Its employees, agents and servants served on the Technical Committee on Special Effects of the National Fire Protective Association (NFPA), the drafter of NFPA 1126, the national standard for the use of pyrotechnics before a proximate audience. Busch Entertainment knew that improperly used pyrotechnics and improperly licensed pyrotechnic displays posed a severe and life threatening danger to those proximate audiences. Busch Entertainment's knowledge of these hazards is knowledge of Anheuser Busch.

835. Busch Entertainment, both individually and as agent of the Anheuser Busch Companies, Inc., owed a duty to patrons of events sponsored, promoted by or affiliated with Anheuser Busch to communicate its knowledge of the dangers of pyrotechnic use before a proximate audience to all such Anheuser Busch affiliates so that those affiliate-promoters/sponsors would not endanger patrons.

836. The defendant Busch Entertainment breached its duties, directly and proximately resulting in injuries to and deaths of the plaintiffs.

**COUNT CVIII**
**BUSCH MEDIA GROUP, INC. – NEGLIGENCE**

837. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Busch Media Group, Inc. is a Delaware corporation having sufficient contact with the State of Rhode Island to be subject to this Court's jurisdiction. On information and belief it is wholly owned by defendant Anheuser Busch Companies, Inc., which controls its day-to-day activities. At all relevant times it was the agent of Anheuser Busch, Inc. and Anheuser Busch Companies, Inc.

838. Busch Media Group, Inc. is the company of the Anheuser Busch Companies which controls the use and dissemination, in advertising, sponsorship and promotion, of the Anheuser Busch and Budweiser name and logo. Busch Media Group, Inc. knew, prior to February 20, 2003, of the power and appeal of the Anheuser Busch and Budweiser names as an enticement for patrons to attend or patronize an event sponsored by or affiliated with the Anheuser Busch name. On information and belief the Busch Media Group, Inc., as an Anheuser Busch company, monitored and regulated the use of the Anheuser Busch and Budweiser name and logo and promulgated rules, guidelines and protocols for its use, which included, inter alia, the mandatory requirement that the Anheuser Busch or Budweiser name and logo not be affiliated with any unlawful or dangerous performance, event or location. Busch Media Group negligently monitored, controlled and regulated the use of Anheuser Busch's names and logos resulting in the promotion of an unlawful and dangerous performance at a venue that violated numerous fire and safety codes.

839. Busch Media Group, Inc. is liable to the plaintiffs for its negligence as an entity, as an agent of the Anheuser Busch Companies and through its agent, McLaughlin and Moran.

**COUNT CIX**
**TVL BROADCASTING OF RHODE ISLAND, LLC – NEGLIGENCE**

840. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant TVL Broadcasting of Rhode Island, LLC (hereinafter "TVL of R.I.") is a Delaware limited liability company doing business as WPRI-Channel 12.

841. At relevant times, TVL of R.I. employed defendant Jeffrey Derderian as an investigative reporter and defendant Brian Butler as a cameraman.

842. TVL of R.I. is vicariously responsible for the actions of defendant Butler and defendant Derderian on February 20, 2003 performed in the course of their employment for TVL of R.I. and WPRI-Channel 12.

843. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 279 and 441 through 444 of this Complaint.

844. TVL of R.I.'s negligence, by and through the actions of its agents, servants and employees Jeffrey Derderian and Brian Butler, was a proximate cause of deaths of and severe personal injuries to Plaintiffs.

**COUNT CX**
**LIN TELEVISION CORPORATION – NEGLIGENCE**

845. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 283, 441 through 444, 447 through 458 and 840 through 844 of this Complaint.

846. Defendant LIN Television Corporation is a corporation organized under the laws of the State of Delaware and having sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

847. At all relevant times, Defendant LIN Television Corporation wholly owned Defendant TVL Broadcasting, Inc. which, in turn, was the managing and sole member of Defendant TVL Broadcasting of Rhode Island, LLC.

848. Defendant LIN Television Corporation also wholly owned Defendant STC Broadcasting, Inc.

849. Jeffrey Derderian and Brian Butler were employed by one of TVL Broadcasting, Inc., TVL Broadcasting of Rhode Island, LLC, or STC Broadcasting, Inc., some combination of them or all of them at relevant times.

850. On information and belief, Defendant LIN Television Corporation so dominated and controlled the affairs of its subsidiaries, TVL Broadcasting, Inc., TVL Broadcasting of Rhode Island, LLC and STC Broadcasting, Inc. as to nullify any immunity which might arise from their separate corporate identities, so that it is liable for the negligence of each subsidiary. Additionally, Defendant LIN Television Corporation's negligence in enforcing its own policies and protocols was a proximate cause of Plaintiffs' deaths and injuries.

**COUNT CXI**
**LIN T.V. CORP. – NEGLIGENCE**

851. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 278 and 845 through 850 of this Complaint.

852. Defendant LIN T.V. Corp. is a corporation organized under the laws of the State of Delaware and having sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

853. At all relevant times, Defendant LIN T.V. Corp. wholly owned Defendant LIN Television Corporation.

854. On information and belief, Defendant LIN T.V. Corp. so dominated and controlled the affairs of its subsidiaries, LIN Television Corporation, TVL Broadcasting, Inc., TVL Broadcasting of Rhode Island, LLC and STC Broadcasting, Inc. as to nullify any immunity which might arise from their separate corporate identities, so that it is liable for the negligence of each subsidiary. Additionally, Defendant LIN T.V. Corp.'s negligence in enforcing its own policies and protocols was a proximate cause of Plaintiffs' deaths and injuries.

**COUNT CXII**
**MARK KENDALL**

855. Plaintiffs incorporate paragraphs 1 through 271 herein. The defendant Mark Kendall is a resident of a state other than Rhode Island. He has sufficient contacts with the State of Rhode Island to be subject to this Court's jurisdiction. On February 20, 2003 he was a member of the band, Great White.

856. The defendant Kendall had a duty to exercise reasonable care for the safety of the patrons at The Station nightclub in connection with the concert performed there by Great White on February 20, 2003.

857. The defendant Kendall aided and assisted in the use of pyrotechnics while failing to use reasonable care and failing to comply with the laws of the State of Rhode Island including, without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

858. Defendant Mark Kendall's failure to use reasonable care and violation of the laws of the State of Rhode Island and the requirements of NFPA 1126 were a proximate cause of deaths of and severe personal injuries to plaintiffs.

**COUNT CXIII**
**DAVID FELICE**

859. Plaintiffs incorporate paragraphs 1 through 271 herein. The defendant David Felice is a resident of a state other than Rhode Island. He has sufficient contacts with the State of Rhode Island to be subject to this Court's jurisdiction. On February 20, 2003 he was a member of the band, Great White.

860. The defendant Felice had a duty to exercise reasonable care for the safety of the patrons at The Station nightclub in connection with the concert performed there by Great White on February 20, 2003.

861. The defendant Felice aided and assisted in the use of pyrotechnics while failing to use reasonable care and failing to comply with the laws of the State of Rhode Island including, without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

862. Defendant David Felice's failure to use reasonable care and violation of the laws of the State of Rhode Island and the requirements of NFPA 1126 were a proximate cause of deaths of and severe personal injuries to plaintiffs.

**COUNT CXIV**
**ERIC POWERS**

863. Plaintiffs incorporate paragraphs 1 through 271 herein. The defendant Eric Powers is a resident of a state other than Rhode Island. He has sufficient contacts with the State of Rhode Island to be subject to this Court's jurisdiction. On February 20, 2003 he was a member of the band, Great White.

864. The defendant Powers had a duty to exercise reasonable care for the safety of the patrons at The Station nightclub in connection with the concert performed there by Great White on February 20, 2003.

865. The defendant Powers aided and assisted in the use of pyrotechnics while failing to use reasonable care and failing to comply with the laws of the State of Rhode Island including, without limitation:

a. the failure to obtain a valid certificate of competency from the State Fire Marshal for the possession and display of pyrotechnics;

b. the failure to obtain a permit for the use and display of proximate pyrotechnics;

c. the failure to comply with the Rhode Island Fire Safety Code for Fireworks and Pyrotechnics (chapter 23-28.11-3 -- 11-10); and

d. failure to display pyrotechnics in accordance with the requirements of the National Fire Protection Association Standard 1126, entitled "Use of Pyrotechnics Before a Proximate Audience."

866. Defendant Eric Powers' failure to use reasonable care and violation of the laws of the State of Rhode Island and the requirements of NFPA 1126 were a proximate cause of deaths of and severe personal injuries to plaintiffs.

**COUNT CXV**
**WM. T. BURNETT & CO., INCORPORATED – NEGLIGENCE**

867. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Wm. T. Burnett & Co., Incorporated, a Maryland corporation previously known as Montevideo, Inc., is the surviving entity of a merger between Montevideo, Inc. and Wm. T. Burnett & Co., Incorporated and is the successor in interest to the original Wm. T. Burnett & Co., Incorporated. It has sufficient contact with the State of Rhode Island to be subject to this Court's jurisdiction.

868. On information and belief, in May and June, 2000, Wm. T. Burnett & Co., Incorporated manufactured and sold to Defendant American Foam Corporation polyurethane foam which the latter in turn sold to the Derderians for installation as soundproofing in The Station nightclub. This product caused severe injuries and death to Plaintiffs.

869. Defendant at all material times owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including Plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

870. Defendant's negligent breach of its duties, including but not limited to defendant's

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product, constituted a proximate cause of Plaintiffs' injuries and deaths.

**COUNT CXVI**
**WM. T. BURNETT & CO., INCORPORATED – STRICT LIABILITY**

871. Plaintiffs repeat and incorporate by reference herein paragraphs 867 through 870 of this complaint.

872. The foam product sold and/or distributed by defendant Wm. T. Burnett & Co., Incorporated was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant Wm. T. Burnett & Co., Incorporated adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including Wm. T. Burnett & Co., Incorporated has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as Wm. T. Burnett & Co., Incorporated, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible

polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant Wm. T. Burnett & Co., Incorporated to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. Wm. T. Burnett & Co., Incorporated had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

873. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

874. Defendant's polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

875. Defendant's polyurethane foam in question contained a design defect that caused plaintiffs harm.

876. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant Wm. T. Burnett & Co., Incorporated.

877. Plaintiffs had no knowledge of the defective condition of the foam product.

878. The extremely hazardous, unreasonably dangerous and defective foam in question was a proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

879. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant Wm. T. Burnett & Co., Incorporated.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. Wm. T. Burnett & Co., Incorporated should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

880. It was foreseeable to defendant Wm. T. Burnett & Co., Incorporated that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

881. It was foreseeable to defendant Wm. T. Burnett & Co., Incorporated that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as Wm. T. Burnett & Co., Incorporated, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

882. It was foreseeable to Wm. T. Burnett & Co., Incorporated that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

883. The defendant's defective foam constituted an active hazard, not a passive condition.

884. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

885. The defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed was a substantial contributing cause of The Station nightclub fire on February 20, 2003.

886. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

887. Defendant's foam in question was not a component part but was an end product itself.

888. Defendant's foam in question was not integrated into any other product.

889. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

890. This integration and defect were a proximate cause of plaintiffs' harm.

891. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT CXVII**
**WM. T. BURNETT & CO., INCORPORATED – BREACH OF WARRANTY**

892. Plaintiffs incorporate paragraphs 1 through 271 herein. Plaintiffs repeat and incorporate by reference herein paragraphs 871 through 891 of this Complaint.

893. Defendant Wm. T. Burnett & Co., Incorporated breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

894. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT CXVIII**
**WM. T. BURNETT OPERATING LLLP, by its sole general partner, Wm. T. Burnett Management, Inc., WM. T. BURNETT MANAGEMENT, INC., individually, and WM. T. BURNETT & CO. – NEGLIGENCE**

895. Plaintiffs incorporate paragraphs 1 through 271 herein. On information and belief, Defendant Wm. T. Burnett Operating LLLP, a Maryland Limited Partnership, by its sole general partner, Wm. T. Burnett Management, Inc. or Wm. T. Burnett Management, Inc., individually, or a corporation called "Wm. T. Burnett & Co.", incorporated in a state unknown to Plaintiffs but with its principal place of business in Maryland (or some combination of them or all of them) is the person or corporation which sold polyurethane foam in 2000 to American Foam Corporation utilizing invoices and shipping documents of "Wm. T. Burnett & Co." Further, on information and belief, both Wm. T. Burnett Operating LLLP and Wm.

T. Burnett Management, Inc. owned and used the tradename "Wm. T. Burnett & Co." Both have sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

896. Defendants Wm. T. Burnett Operating LLLP, Wm. T. Burnett Management, Inc. and Wm. T. Burnett & Co. (hereinafter collectively "Burnett LLLP" or "Defendant"), at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

897. Defendant's negligent breach of its duties, including but not limited to defendant's

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product, constituted a proximate cause of Plaintiffs' injuries and deaths.

## COUNT CXIX
## WM. T. BURNETT OPERATING LLLP, BY ITS SOLE GENERAL PARTNER, Wm. T. Burnett Management, Inc., WM. T. BURNETT MANAGEMENT, INC., individually, and WM. T. BURNETT & CO. – STRICT LIABILITY

898. Plaintiffs incorporate paragraphs 1 through 271 herein. Plaintiffs repeat and incorporate by reference paragraphs 895 through 897 of this Complaint.

899. The foam product sold and/or distributed by defendant "Burnett LLLP" was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant "Burnett LLLP" adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyurethane foam industry including "Burnett LLLP" has recognized that certain applications and locations of use of polyurethane foam were "high risk" because of the fire characteristics of polyurethane foam. Some high-risk applications included the use of polyurethane foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyurethane foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyurethane foam industry, and particularly sophisticated manufacturers such as "Burnett LLLP," have for decades had specialized knowledge of the extreme flammability hazard of the type of polyurethane foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of flexible polyurethane under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant "Burnett LLLP" to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. "Burnett LLLP" had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

900. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

901. Defendant's polyurethane foam in question contained a manufacturing defect that caused plaintiffs harm.

902. Defendant's polyurethane foam in question contained a design defect that caused plaintiffs harm.

903. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant "Burnett LLLP."

904. Plaintiffs had no knowledge of the defective condition of the foam product.

905. The extremely hazardous, unreasonably dangerous and defective foam in question was a proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

906. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant "Burnett LLLP."

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. "Burnett LLLP" should have taken steps to prevent it.

B. Polyurethane foam used as an interior finish has been the primary fuel load in fatal fires in places of public assembly for decades. There have been repeated, highly-publicized instances of application of polyurethane foam products as interior finishes in places of public assembly, i.e., nightclubs which were involved in fire, and the presence of the product was either the primary fuel load or a significant contributor to the fire.

C. One of the defendant's intended uses for which flexible polyurethane foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

D. There would be no way for the general public to distinguish between flame retardant flexible polyurethane foam and the non-flame retardant variety.

E. Defendant knew that its polyurethane foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

907. It was foreseeable to defendant "Burnett LLLP" that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

908. It was foreseeable to defendant "Burnett LLLP" that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as "Burnett LLLP," that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

909. It was foreseeable to "Burnett LLLP" that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

> A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.
>
> B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

910. The defendant's defective foam constituted an active hazard, not a passive condition.

911. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

912. The defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed was a substantial contributing cause of The Station nightclub fire on February 20, 2003.

913. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

914. Defendant's foam in question was not a component part but was an end product itself.

915. Defendant's foam in question was not integrated into any other product.

916. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

917. This integration and defect were a proximate cause of the plaintiffs' harm.

918. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**<u>COUNT CXX</u>**
**<u>WM. T. BURNETT OPERATING LLLP, by its sole general partner, Wm. T. Burnett Management, Inc., WM. T. BURNETT MANAGEMENT, INC., individually, and WM. T. BURNETT & CO. – BREACH OF WARRANTY</u>**

919. Plaintiffs incorporate paragraphs 1 through 271 herein. Plaintiffs repeat and incorporate by reference paragraphs 895 through 918 of this Complaint.

920. Defendant Burnett LLLP breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said polyurethane foam.

921. As a direct and proximate result of said breach, Plaintiffs suffered injuries or death.

**COUNT CXXI**
**SEALED AIR – NEGLIGENCE**

922. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendants Sealed Air Corporation and Sealed Air Corporation, U.S. (hereinafter, collectively, "Sealed Air" or "defendant") are Delaware corporations having sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

923. Sealed Air (either or both corporations) designed, manufactured and/or distributed and/or sold polyethylene foam product which in or about June, 1996 came to be installed as soundproofing material at The Station nightclub.

924. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

925. Defendant's negligent breach of its duties, including but not limited to defendant's

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product, constituted a proximate cause of Plaintiffs' injuries and deaths.

**COUNT CXXII**
**SEALED AIR – STRICT LIABILITY**

926. Plaintiffs repeat and incorporate by reference herein paragraphs 922 through 925 of this Complaint.

927. The foam product sold and/or distributed by defendant Sealed Air was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant Sealed Air adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyethylene foam industry including Sealed Air has recognized that certain applications and locations of use of polyethylene foam were "high risk" because of the fire characteristics of polyethylene foam. Some high-risk applications included the use of polyethylene foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyethylene foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyethylene foam industry, and particularly sophisticated manufacturers such as Sealed Air, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyethylene foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of polyethylene foam under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant Sealed Air to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. Sealed Air had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

928. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

929. Defendant's polyethylene foam in question contained a manufacturing defect that caused plaintiffs harm.

930. Defendant's polyethylene foam in question contained a design defect that caused plaintiffs harm.

931. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant Sealed Air.

932. Plaintiffs had no knowledge of the defective condition of the foam product.

933. The extremely hazardous, unreasonably dangerous and defective foam in question was a proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

934. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant Sealed Air.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. Sealed Air should have taken steps to prevent it.

B. One of the defendant's intended uses for which polyethylene foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

C. There would be no way for the general public to distinguish between flame retardant flexible polyethylene foam and the non-flame retardant variety.

D. Defendant knew or should have known that its polyethylene foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

935. It was foreseeable to defendant Sealed Air that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

936. It was foreseeable to defendant Sealed Air that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers

such as Sealed Air, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

937. It was foreseeable to Sealed Air that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

938. The defendant's defective foam constituted an active hazard, not a passive condition.

939. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

940. The defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed was a substantial contributing cause of The Station nightclub fire on February 20, 2003.

941. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

942. Defendant's foam in question was not a component part but was an end product itself.

943. Defendant's foam in question was not integrated into any other product.

944. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

945. This integration and defect were a proximate cause of the plaintiffs' harm.

946. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT CXXIII**
**SEALED AIR – BREACH OF WARRANTY**

947. Plaintiffs repeat and incorporate by reference paragraphs 922 through 946 of this Complaint.

948. Defendant Sealed Air breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said foam.

949. As a direct and proximate result of said breach, Plaintiffs suffered injuries and death.

**COUNT CXXIV**
**SENTINEL PRODUCTS CORP. – NEGLIGENCE**

950. Plaintiffs incorporate paragraphs 1 through 271 herein. Defendant Sentinel Products Corp. (hereinafter "Sentinel") is a New York corporation having sufficient contacts with Rhode Island to be subject to this Court's jurisdiction.

951. Sentinel designed, manufactured and/or distributed and/or sold polyethylene foam product which in or about June, 1996 came to be installed as soundproofing material at The Station nightclub.

952. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including Plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

953. Defendant's negligent breach of its duties, including but not limited to defendant's

a. failure to use due care in the manufacture, sale or distribution of the foam product.

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product.

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product, constituted a proximate cause of Plaintiffs' injuries and deaths.

**COUNT CXXV**
**SENTINEL PRODUCTS CORP. – STRICT LIABILITY**

954. Plaintiffs repeat and incorporate by reference paragraphs 950 through 953 of this Complaint.

955. The foam product sold and/or distributed by defendant Sentinel was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant Sentinel adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyethylene foam industry including Sentinel has recognized that certain applications and locations of use of polyethylene foam were "high risk" because of the fire characteristics of polyethylene foam. Some high-risk applications included the use of polyethylene foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyethylene foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyethylene foam industry, and particularly sophisticated manufacturers such as Sentinel, have for decades had specialized knowledge of the extreme flammability hazard of the type of polyethylene foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of polyethylene foam under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant Sentinel to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. Sentinel had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

956. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

957. Defendant's polyethylene foam in question contained a manufacturing defect that caused plaintiffs harm.

958. Defendant's polyethylene foam in question contained a design defect that caused plaintiffs harm.

959. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant Sentinel.

960. Plaintiffs had no knowledge of the defective condition of the foam product.

961. The extremely hazardous, unreasonably dangerous and defective foam in question was a proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

962. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant Sentinel.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. Sentinel should have taken steps to prevent it.

B. One of the defendant's intended uses for which polyethylene foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

C. There would be no way for the general public to distinguish between flame retardant flexible polyethylene foam and the non-flame retardant variety.

D. Defendant knew or should have known that its polyethylene foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

963. It was foreseeable to defendant Sentinel that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

964. It was foreseeable to defendant Sentinel that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers

such as Sentinel, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

965. It was foreseeable to Sentinel that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

966. The defendant's defective foam constituted an active hazard, not a passive condition.

967. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

968. The defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed was a substantial contributing cause of The Station nightclub fire on February 20, 2003.

969. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

970. Defendant's foam in question was not a component part but was an end product itself.

971. Defendant's foam in question was not integrated into any other product.

972. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

973. This integration and defect were a proximate cause of the plaintiffs' harm.

974. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT CXXVI**
**SENTINEL PRODUCTS CORP. – BREACH OF WARRANTY**

975. Plaintiffs repeat and incorporate by reference paragraphs 950 through 974 of this Complaint.

976. Defendant Sentinel breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said foam.

977. As a direct and proximate result of said breach, Plaintiffs suffered serious injuries and death.

**COUNT CXXVII**
**TENNECO/PACTIV/PREGIS SUCCESSORS IN INTEREST – NEGLIGENCE**
**(PACTIV CORPORATION, PREGIS CORPORATION and PREGIS INNOVATIVE PACKAGING, INC.)**

978. Plaintiffs incorporate paragraphs 1 through 271 herein. In or about 1996, Tenneco Packaging, Inc. manufactured, sold and distributed four-ply closed-cell polyethylene foam which came to be installed as soundproofing at The Station nightclub in or about June, 1996.

979. In 1999 Tenneco Packaging, Inc. changed its name to Pactiv Corporation, which is presently a Delaware corporation having sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

980. In 2005 Pactiv Corporation entered a stock sale agreement, along with certain of its affiliates (including Pactiv Protective Packaging, Inc.) whereby the global protective packaging business of Pactiv would be acquired by a new entity, Pregis Corporation. Pregis Corporation is a Delaware corporation having sufficient contact with Rhode Island to be subject to this Court's jurisdiction.

981. On information and belief, Pregis Innovative Packaging, Inc. is a subsidiary of Pregis Corporation and is the successor in interest to Pactiv Corporation (previously known as Tenneco Packaging, Inc.). Pregis Innovative Packaging, Inc. is a Delaware corporation having sufficient contacts with Rhode Island to be subject to this Court's jurisdiction.

982. On information and belief, each of Pactiv Corporation, Pregis Corporation and Pregis Innovative Packaging, Inc., some combination of them or all of them (hereinafter collectively referred to as "Pactiv/Pregis" or "defendant"), is/are the corporation which manufactured and sold the subject polyethylene foam or is/are the successor(s) in interest to the corporation which manufactured and sold the four-ply closed-cell polyethylene foam which came to be installed in The Station nightclub in or about 1996.

983. Defendant Pactiv/Pregis at all material times owed a duty of due care to all purchasers and/or ultimate users and/or recipients and/or persons coming in contact with the foam product, including Plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

984. Defendant, at all material times, owed a duty of due care to all purchasers and/or ultimate users and/or recipients of the foam product, including Plaintiffs, in the design, manufacture, testing, inspecting, marketing, producing, selling or distributing of the foam product.

985. Defendant's negligent breach of its duties, including but not limited to defendant's

a. failure to use due care in the manufacture, sale or distribution of the foam product;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the foam product;

c. failure to otherwise adequately test the foam product before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the foam product;

f. failing to provide adequate protection for persons coming into contact with the foam product, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, packaging, labeling, provision, distribution and/or sale of the foam product, constituted a proximate cause of Plaintiffs' injuries and deaths.

986. The foam product sold and/or distributed by defendant Pactiv/Pregis was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold for the following reasons:

A. It was manufactured and sold untreated without any flame-retardant chemicals. The defendant's foam possessed extraordinarily dangerous and defective flammability properties.

B. It ignited too easily, burned too vigorously once ignited and produced unreasonably dangerous toxic smoke and gases.

C. It was manufactured, sold, marketed and distributed without adequate warnings.

1. The requirement that defendant Pactiv/Pregis adequately and accurately warn derives, in part, from the fact that there is no safe use for defendant's foam where a known fire hazard can exist or where fire is of the slightest concern.

2. For decades the polyethylene foam industry including Pactiv/Pregis has recognized that certain applications and locations of use of polyethylene foam were "high risk" because of the fire characteristics of polyethylene foam. Some high-risk applications included the use of polyethylene foam in places of public assembly such as auditoria, hotels and nightclubs. The extreme danger of non-flame retardant polyethylene foam in such places, and the magnitude of the potential harm in the event of fire, has been well recognized.

3. The polyethylene foam industry, and particularly sophisticated manufacturers such as Pactiv/Pregis, have for decades had specialized knowledge of the extreme

flammability hazard of the type of polyethylene foam present in The Station at the time of the fire.

4. The general public does not possess this specialized expertise and knowledge. Therefore, the hazardous nature of polyethylene foam under fire conditions is not known or obvious to the public.

D. It was manufactured, sold, marketed and distributed without any necessary product stewardship.

1. There was a need for defendant Pactiv/Pregis to follow "product stewardship" practices in order to insure that hazardous products would not be used in an environment that would be a high risk to the public.

2. Product stewardship is a widely used practice that follows the use of raw materials, intermediate products and final goods through the design, manufacture, marketing, distribution, use and disposal to insure proper application and use in order to protect the public.

3. Pactiv/Pregis had to be satisfied that its foam plastic product was going to be used in a safe application before it sold it.

4. In order to provide a product that meets the physical and safety needs of the occupancy and manner in which it will be used, it is essential that foam producers be fully aware of all of the possible and potential applications of the foam that they produce.

987. Defendant had actual knowledge that its foam in question was defective and unreasonably dangerous as designed, manufactured, marketed, distributed and sold.

988. Defendant's polyethylene foam in question contained a manufacturing defect that caused plaintiffs harm.

989. Defendant's polyethylene foam in question contained a design defect that caused plaintiffs harm.

990. The defendant's foam which was on the walls of The Station nightclub on February 20, 2003 was in the exact same condition chemically and flammability-wise as it was when it was manufactured and sold by the defendant Pactiv/Pregis.

991. Plaintiffs had no knowledge of the defective condition of the foam product.

992. The extremely hazardous, unreasonably dangerous and defective foam in question was a proximate cause of the plaintiffs' injuries and deaths which occurred as a result of The Station nightclub fire.

993. The use to which this foam was put, i.e., being installed on the walls of The Station nightclub as acoustical insulation was reasonably foreseeable to defendant Pactiv/Pregis.

A. The use and misuse of foam plastic as an interior finish in a place of public assembly, i.e., a nightclub, is a foreseeable hazard. Pactiv/Pregis should have taken steps to prevent it.

B. One of the defendant's intended uses for which polyethylene foam is manufactured and sold is as a sound absorption or "sound-proofing" material, which was its use at the time of the fire.

C. There would be no way for the general public to distinguish between flame retardant flexible polyethylene foam and the non-flame retardant variety.

D. Defendant knew or should have known that its polyethylene foam product in question, untreated with any fire retardant chemicals, was often installed in places of public assembly including nightclubs such as The Station nightclub.

994. It was foreseeable to defendant Pactiv/Pregis that a source of ignition would exist in The Station nightclub and lead to the ignition of the defendant's defective foam.

A. Ignition, either accidentally or intentionally, of a hazardous product in a nightclub environment is foreseeable.

995. It was foreseeable to defendant Pactiv/Pregis that state and town fire inspectors would fail to identify and require removal of defendant's defective foam.

A. It was foreseeable that the great majority of state and town fire inspectors, including those in West Warwick, were not sufficiently trained and not being certified in accordance with National Fire Protection Association Standards.

B. Due to that inadequate training, and also due to budgetary limitations and other reasons, it was foreseeable by manufacturers such as Pactiv/Pregis, that such fire inspectors could be expected to inadequately inspect nightclubs such as The Station nightclub.

996. It was foreseeable to Pactiv/Pregis that its defective foam would be ignited in an overcrowded nightclub with inadequate exits and other means of egress.

A. Nightclub fires have the potential to cause high fire casualties due to maximum or over-capacity crowds, especially on weekends, during live music performances, or because of special events or promotions.

B. In the event of a fire, there is a very significant risk that a full or over capacity crowd would panic or would otherwise have difficulty completely exiting.

997. The defendant's defective foam constituted an active hazard, not a passive condition.

998. The defendant's defective foam was not a remote cause of the fire but was an immediate cause.

999. The defectiveness and unreasonable dangerousness of defendant's product as designed, manufactured, marketed, sold, distributed and installed was a substantial contributing cause of The Station nightclub fire on February 20, 2003.

1000. Defendant's foam in question was not a bulk product as would be protected by § 5 Restatement Torts, 3rd.

1001. Defendant's foam in question was not a component part but was an end product itself.

1002. Defendant's foam in question was not integrated into any other product.

1003. Even if defendant's foam was a component and even if it was integrated into another product, defendant's foam in question caused the product it was integrated into to be defective.

1004. This integration and defect were a proximate cause of the plaintiffs' harm.

1005. Even if defendant's foam in question was a component and even if it was integrated into another product, the integration was done by an unsophisticated buyer.

**COUNT CXXVIII**
**TENNECO/PACTIV/PREGIS SUCCESSORS IN INTEREST – STRICT LIABILITY**

1006. Plaintiffs repeat and incorporate by reference paragraphs 978 through 1005 of this Complaint.

1007. Defendant Pactiv/Pregis (individually and collectively) is liable to Plaintiffs based upon the theory of strict liability.

**COUNT CXXIX**
**TENNECO/PACTIV/PREGIS SUCCESSORS IN INTEREST – BREACH OF WARRANTY**

1008. Plaintiffs repeat and incorporate by reference paragraphs 978 through 1005 of this Complaint.

1009. Defendant Pactiv/Pregis (collectively) breached express and implied warranties of merchantability and fitness in the sale and distribution of said foam product.

1010. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT CXXX**
**LUNA TECH PYROTECHNIK GmbH and LUNA TECH EURO GmbH – NEGLIGENCE**

1011. Plaintiffs repeat and incorporate by reference paragraphs 1 through 271.

1012. Defendants Luna Tech Pyrotechnik GmbH and Luna Tech Euro GmbH (hereinafter collectively "Luna Tech GmbH" or "defendant") are corporations organized under the laws of Germany and having sufficient contact with the State of Rhode Island to be subject to this Court's jurisdiction.

1013. Luna Tech GmbH (either or both corporations) manufactured and/or sold the pyrotechnics used by the band Great White at The Station on February 20, 2003.

1014. At all material times defendant owed a duty of care to ultimate users or recipients of its pyrotechnics, including plaintiffs, in designing, manufacturing, testing, inspecting, marketing, producing, selling it or distributing the pyrotechnics.

1015. Defendant's negligent breach of its duties, including but not limited to,

a. failure to use due care in the manufacture, sale or distribution of the pyrotechnics;

b. failure to make or cause to be made reasonable research and/or testing as to the effects of the pyrotechnics;

c. failure to otherwise adequately test the pyrotechnics before providing it, distributing it or selling it;

d. failure to warn potential and actual users of the product of its potential hazards;

e. failure to properly and adequately educate users about the use and hazards of the pyrotechnics.

f. failing to provide adequate protection for persons coming into contact with the pyrotechnics, such as plaintiffs, from suffering the injuries which plaintiffs suffered; and

g. otherwise failing to use due care in the design, manufacture, testing, inspecting, marketing advertising, labeling, packaging, provision, distribution and/or sale of the pyrotechnics, constituted a proximate cause of Plaintiffs' injuries and deaths.

**COUNT CXXXI**
**LUNA TECH PYROTECHNIK GmbH and LUNA TECH EURO GmbH – STRICT LIABILITY**

1016. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 1012 through 1015 of this Complaint.

1017. The pyrotechnics sold and/or distributed by defendant contained defects making them unreasonably dangerous to all actual and potential users or recipients of the pyrotechnics, including plaintiffs.

1018. Plaintiffs had no knowledge of the defective condition of the pyrotechnics.

1019. The pyrotechnics were in substantially the same condition, when used, as when they left defendant's control.

1020. As a direct and proximate result of the failure of the pyrotechnics sold and/or distributed by defendant, plaintiffs suffered death or injuries.

**COUNT CXXXII**
**LUNA TECH PYROTECHNIK GmbH and LUNA TECH EURO GmbH – BREACH OF WARRANTY**

1021. Plaintiffs repeat and incorporate by reference herein paragraphs 1 through 271 and 1012 through 1020.

1022. Defendant Luna Tech GmbH breached express and implied warranties of merchantability and fitness in the manufacture, sale and distribution of said pyrotechnics.

1023. As a direct and proximate result of said breach, Plaintiffs suffered death or injuries.

**COUNT CXXXIII**
**GRESHAM & ASSOCIATES OF RHODE ISLAND, INC.**

1024. Defendant Gresham & Associates of Rhode Island, Inc. (hereinafter "Gresham of Rhode Island") is a corporation organized under the laws of the State of Georgia and registered to do business in Rhode Island. It is in the business of selling insurance.

1025. At various times, including but not limited to October 8, 2002, Gresham of Rhode Island, through its agents and servants, conducted inspections of the insured premises.

1026. Gresham of Rhode Island was negligent in performing said inspections. Its negligence included without limitation:

a. failing to adequately inspect The Station for safety hazards and fire/building code violations;

b. failing to note the presence of highly flammable surface treatments;

c. failing to note the inadequacy of exits;

d. failing to note practices of overcrowding;

e. allowing the use of dangerous pyrotechnic devices during performances at The Station;

f. knowing of numerous dangerous conditions and fire hazards at The Station and failing to remedy those conditions or order the insureds to remedy them;

g. failing to protect members of the public for the foreseeable risk of serious injury or death at The Station;

h. failing to adequately oversee, supervise, monitor, evaluate, train and/or retrain those performing inspections of The Station;

i. other acts and failures to act that may become apparent after discovery.

1027. Defendant Gresham of Rhode Island, in undertaking to perform said inspections, recognized or should have recognized that the competent performance of the inspections was necessary for the protection of third persons, including Plaintiffs.

1028. Gresham of Rhode Island's insureds, including the Derderians, relied upon the results and recommendations of said negligently performed inspections.

1029. The negligence of Gresham of Rhode Island was a proximate cause of Plaintiffs' deaths and injuries.

**PRAYERS FOR RELIEF**

**WHEREFORE:**

**Claims of Decedents' Estates**

(a) All Plaintiffs representing estates of decedents pray for compensatory damages on behalf of said estates for the decedents' medical expenses, funeral expenses, lost wages and lost earning capacity during survival period, pain and suffering both physical and mental and loss of life's enjoyment against all defendants*, pursuant to R.I.G.L. §10-7-5, et seq., jointly and severally, in such amounts as a jury deems proper, plus interest and costs;

**Wrongful Death Claims**

(b) All Plaintiffs representing wrongful death beneficiaries pray for damages against all defendants* pursuant to R.I.G.L. §10-7-1, et seq., jointly and severally, in such amounts as a jury deems proper, plus interest and costs;

**Death Cases – Loss of Spousal Consortium**

(c) All Plaintiffs suing in their capacities as surviving spouses, or representatives of surviving spouses, of decedents pray for damages against all defendants* for loss of spousal consortium pursuant to R.I.G.L. §10-7-1.2(a), jointly and severally, in such amounts as a jury deems proper, plus interest and costs;

**Death Cases – Loss of Parental Society and Companionship**

(d) All Plaintiffs suing in their capacities as surviving minor children, or representatives of surviving minor children, of decedents pray for damages against all defendants* for loss of parental society and companionship pursuant to R.I.G.L. §10-7-1.2(b), jointly and severally, in such amounts as a jury deems proper, plus interest and costs;

**Personal Injuries**

(e) All Plaintiffs suing individually, or representatives of plaintiffs suing individually, who were injured in The Station nightclub fire hereby pray for compensatory damages against all defendants* for their personal injuries sustained as a result of the fire including, but not limited to, medical expenses, lost wages and loss of earning capacity, pain and suffering both

physical and mental, scarring, deformity, and disability, all of which may be permanent, jointly and severally, in such amounts as a jury deems proper, plus interest and costs;

**Personal Injuries – Loss of Spousal Consortium**

(f) All Plaintiffs suing in their capacity as spouse, or representatives of a spouse, of a person who was injured in The Station nightclub fire pray for damages for loss of consortium pursuant to R.I.G.L. §9-1-41(a) against all defendants*, jointly and severally, in such amounts as a jury deems proper, plus interest and costs.

**Personal Injuries – Loss of Parental Society and Companionship**

(g) All Plaintiffs suing in their capacity as minor children or as representatives of minor children of persons injured in The Station nightclub fire pray for damages for loss of parental society and companionship pursuant to R.I.G.L. §9-1-41(b), against all defendants*, jointly and severally, in such amounts as a jury deems proper, plus interest and costs;

**Bystander Emotional Distress**

(h) All Plaintiffs who are closely related to a victim of The Station nightclub fire and who suffered emotional distress from perceiving their loved ones' pain and suffering during and after the fire pray for compensatory damages against all defendants*, jointly and severally, in such amounts as a jury deems proper, plus interest and costs.

**Fraudulent Transferees of Property – Rescission**

(i) All Plaintiffs in all capacities pray for the rescission and reconveyance of all property transfers by other defendants to Defendant Framingham-150 FR Realty Limited Partnership, Defendant Seekonk-226 Limited Partnership and Defendant Frances A. Carolan which were undertaken to defraud, hinder or delay creditors, including Plaintiffs.

* Plaintiffs #38 (Cordier) make no claims against Defendant D16; Plaintiffs #50 (King), #72 (DeMaio), #100 (Arpin), #102 (Beese) and #163 (Choquette) make no claims against Defendants D1, D2 and D3; Plaintiffs #164 (N. Conant) and #165 (S. Conant) make no claims against Defendant D8; Plaintiff #224 (Trudeau) makes no claims against Defendants D14, D15 or D16; Plaintiff #86 (Rager) makes no claim against Defendant D9; Plaintiff #131 (Prudhomme) makes no claim against Defendant D20.

**JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues.

Respectively submitted:

Neil Gonsalves,
Administrator of the Estate of Michael J. Gonsalves
By his Attorneys,

Russell Bramley, Esq. (#1781)
Haronian, Bramley & Harrington
Centerville Commons
875 Centerville Road
Building Two, Unit 4B6
Warwick, RI 02886